**Abdeen M. JABARA, Plaintiff,**

v.

**Clarence M. KELLEY et al., Defendants.**

**Civ. No. 39065.**

United States District Court,
E. D. Michigan, S. D.

June 13, 1979.

**564**

John H. F. Shattuck, American Civil Liberties Union, Washington, D. C., and Ronald Reosti, Detroit, Mich., for plaintiff.

R. John Seibert, Washington, D. C., and L. Michael Wicks, Detroit, Mich., for defendants.

## MEMORANDUM OPINION

RALPH M. FREEMAN, District Judge.

This case presents a constitutional and statutory challenge to various practices employed by the National Security Agency, the Federal Bureau of Investigation and several of their agents in conducting an investigation of the plaintiff. Although long, the history of this case is one consisting mainly of contested discovery matters, most of which have involved various privilege claims on the part of the government. See *Jabara v. Kelley,* 75 F.R.D. 475 (E.D. Mich.1977); *Jabara v. Kelley,* No. 3–9065 (E.D.Mich. June 27, 1975); *Jabara v. Kelly,* 62 F.R.D. 424 (E.D.Mich.1974). The motions now before the Court, the defendants' motion to dismiss and for summary judgment and the plaintiff's motion for summary judgment, represent the first time the Court has been called upon to resolve the merits of this suit.

The facts in this case have been developed through a long and tedious process of discovery which has caused the Court a great deal of concern. However, the Court is now satisfied that the plaintiff has received all of the requested discovery material to which he is entitled. Similarly, the Court is satisfied that the disclosures required of the defendants have not compromised the national security or any ongoing criminal or national security investigation.

Because the Court has upheld certain governmental claims of executive privilege and the state secrets privilege, the following summary of facts is necessarily incomplete. Although the public record is incomplete, the defendants, during the course of this litigation, have submitted various *in camera* affidavits upon which they now rely in support of their motions.

## I FACTS

The plaintiff, Abdeen Jabara, a Detroit attorney, has been and is an active member of or participant in various Arab organizations. Beginning in 1967, the FBI began investigating Jabara and that investigation continued with some interruptions until December, 1975. The investigation, although appearing to have some continuity, involved a plurality of discrete and independent events, each of which has led to some FBI intelligence gathering activity directed at Jabara. Although the investigation did involve at least one criminal aspect, the record is devoid of any evidence linking the plaintiff to the commission or anticipated commission of any specific crime. Instead, the defendants seek to justify their intrusions into the plaintiff's life as a legitimate national security investigation.

The investigatory tactics employed by the FBI include physical surveillance by informants and agents, inspection of Jabara's bank records, warrantless electronic surveillance by the FBI and NSA, interviews of third parties regarding Jabara and the maintenance and dissemination of information gained during the investigation.

The most frequently used investigatory tactic was the use of informants who reported on Jabara's presence at various public and private political gatherings. In addition to reporting Jabara's presence at such gatherings, the information supplied by the informant usually included a summary of political discussions or speeches by Jabara. In addition, the FBI file contains several reports which appear to have resulted from the physical surveillance of the plaintiff. The record also supports the conclusion that much of the public and private surveillance of Jabara was the result of incidental contacts. In other words, the presence of FBI informants at meetings and discussions attended by Jabara does not appear to have resulted solely from an investigatory interest in Jabara. Included in information regarding Jabara is data which the FBI has received from Zionist sources.

In addition to the surveillance mentioned above and as a part of broader national

security investigation, the FBI sought to obtain information regarding Jabara's bank records. Although there is some dispute regarding the scope of this portion of the investigation, it does appear that the FBI obtained information regarding a deposit to one of Jabara's accounts, revealing the identity of one of his clients.

The record also establishes that Jabara's telephone and wire communications have been intercepted by the FBI and NSA. On several occasions the FBI has incidentally intercepted Jabara communications pursuant to electronic surveillance directed at others. Furthermore, the FBI, as part of its investigation of Jabara, requested that NSA forward to the Bureau any information coming into its possession regarding the plaintiff. Pursuant to this request NSA supplied the FBI with several summaries of Jabara's foreign wire communications. None of these electronic surveillance activities were conducted pursuant to a warrant.

The information obtained through these various investigatory tactics has been recorded and maintained in FBI files. In addition, the FBI has disseminated information regarding Jabara in its possession to 17 government agencies and three foreign governments.

From this factual basis, Jabara seeks relief pursuant to eight separate causes of action. The first cause of action alleges a violation of the fourth amendment and 18 U.S.C. §§ 2511 and 2520 as the result of the defendants' electronic surveillance of Jabara's telephone and other communications. The second cause of action alleges that the defendants' conduct violated the plaintiff's first amendment rights of freedom of speech and association. The third cause of action alleges warrantless searches, seizures and collection of information in violation of the first and fourth amendments. The fourth cause of action alleged that the interception of conversations between the plaintiff and his clients violated the clients' sixth amendment rights, and damaged Ja-

bara's professional reputation and his ability to pursue his profession in violation of the first and fifth amendments. The fifth cause of action alleges unreasonable invasions of the plaintiff's privacy in violation of the first, fourth, fifth and ninth amendments. The sixth cause of action alleges that the inspection of the plaintiff's bank records violated the fourth amendment. The seventh cause of action alleges that the conduct of the FBI in this case exceeds its statutory authority and is also beyond the constitutional authority of the executive branch of the federal government. The eighth cause of action alleges that the defendants have violated various provisions of the Privacy Act by maintaining and disseminating records concerning Jabara's first amendment activities.

As part of the relief sought the plaintiff requests an injunction against the defendants' further interception of his wire communications; an injunction prohibiting the defendants from conducting surveillance, collecting, recording, maintaining, using or disseminating information of any kind about the lawful political, social, banking, telephone and other activities of the plaintiff; a mandatory injunction ordering the defendant FBI to produce before the Court for destruction all records or other materials of any kind maintained by them concerning Jabara's constitutionally protected activities.[1]

## II MOOTNESS

The defendants contend that Jabara's claims for declaratory and injunctive relief should be dismissed as moot because of the current status of the FBI investigation of the plaintiff. First, the FBI, through the affidavit of Special Agent Robert F. Peterson, asserts that in December 1975, it determined that it had no further investigatory interest in Jabara and thereupon terminated its investigation. Second, the defendants have agreed to destroy all files maintained under Jabara's name as requested by Jabara. Third, the FBI has submitted an extensive set of guidelines

---

1. Jabara has also submitted a claim for damages. That claim is not at issue here since the Court has bifurcated this suit with respect to the issues of liability and damages.

relating to criminal and security investigations which it contends protects against the possibility of future abusive conduct such as that alleged in the plaintiff's second amended complaint.

While some Courts have refused to grant injunctive relief where official policy revisions have, in effect, made continuation of the challenged conduct impossible, see *Washington Free Community, Inc. v. Wilson,* 157 U.S.App.D.C. 360, 484 F.2d 1078 (1973), and other courts have recognized that injunctions should be cautiously issued against police conduct on the mere possibility that it may be repeated, see *Long v. District of Columbia,* 152 U.S.App.D.C. 187, 469 F.2d 927 (1972), the Court is of the opinion that Jabara's claim for injunctive relief is not moot. The Court has examined the extensive set of regulations submitted by the FBI and cannot conclude that they preclude conduct of the type alleged here. Indeed, many sections of the defendants' brief could, in another context, be used to support an argument that the FBI's conduct in this case was within the ambit of those regulations. Therefore, the Court cannot conclude that these guidelines would necessarily inhibit future FBI conduct of the kind alleged in this case and, therefore, does not render Jabara's claim for relief moot.

Nor is the Court persuaded that the cessation of the Jabara investigation requires that the plaintiff's claims be dismissed as moot. Numerous Supreme Court antitrust decisions have cautioned against declaring a case moot where the defendant would be free to reinstitute the complained of practice. *United States v. Phosphate Export Ass'n,* 393 U.S. 199, 89 S.Ct. 361, 21 L.Ed.2d 344 (1968); *United States v. W. T. Grant Co.,* 345 U.S. 629, 73 S.Ct. 894, 97 L.Ed. 1303 (1953). This consideration applies with even more force where the defendant, although agreeing to stop the conduct in question, continues to assert its legality. *Walling v. Helmerich & Payne, Inc.,* 323 U.S. 37, 65 S.Ct. 11, 89 L.Ed. 29 (1944).

Based on these decisions, the Court cannot conclude Jabara's claim for injunctive relief is moot. Although the FBI has claimed to have stopped the Jabara investigation in 1975, neither the Court nor the plaintiff were aware of this fact until October, 1978, when the defendants moved for a summary judgment with respect to the second amended complaint. Furthermore, there is no indication that Jabara's political views or his willingness to assert them have changed. Considering the amount of FBI attention focused on Jabara's political activities, it is hard to conclude that the investigatory interest of the FBI will not be rekindled in the future. Furthermore, given the fervor with which the FBI asserts the legality of its conduct, the Court is of the opinion that the chance of recurrence is all the more probable.

The Court might be persuaded to accept the defendants' argument were the investigation more limited in scope or time. However, given the length of the investigation along with the numerous investigatory tactics employed, the Court finds it difficult to conclude that the FBI would not reinstitute actions against Jabara. Considerations of this type militate against a finding of mootness in cases such as this. *Berlin Democratic Club v. Rumsfeld,* 410 F.Supp. 144 (D.D.C.1976).

In sum, the Court is of the opinion that the FBI's posture with respect to the cessation of the challenged conduct along with the existence of what the Court perceives to be important and unresolved legal issues militates heavily against declaring the plaintiff's claim for injunctive relief moot.

The defendants also contend that the cessation of the Jabara investigation and the willingness of the FBI to undertake file destruction makes the plaintiff's claim for declaratory relief moot. In essence, the defendants maintain that in its present posture the case lacks the immediacy and reality necessary to justify a declaratory judgment. See *Maryland Casualty Co. v. Pacific Coal & Oil Co.,* 312 U.S. 270, 61 S.Ct. 510, 85 L.Ed. 826 (1941).

█ There is no question that a controversy exists with respect to the legality of the defendants' conduct. The only issue is

whether the alleged cessation of this activity is sufficient to deprive this case of the required reality and immediacy. In its discussion of mootness with respect to injunctive relief, the court pointed to many factors which permit an inference that the FBI's investigation of Jabara could well be reopened. This is not a situation where the defendant has admitted that his conduct is illegal or has forsworn any intent to engage in similar conduct in the future. To the contrary, the defendants earnestly and vigorously assert the legality of their conduct. Furthermore, the defendants have asserted that one of their reasons for attempting to avoid a declaratory judgment in this case is so that they will be unfettered in future investigations of Jabara should such investigations become necessary. Assuming that Jabara continues to publicly and privately espouse his political views, an activity in which the defendants have an apparent interest, the Court cannot conclude that the probability of similar conduct occurring in the future is all that remote. Upon consideration of the above cited factors, therefore, the Court is of the opinion that this case is one where the threat of future investigation is sufficiently real to permit Jabara to pursue the remedy of a declaratory judgment.

## III *JUSTICIABILITY*

The defendants maintain that Jabara's first amendment claims are not justiciable at least insofar as they relate to certain investigatory practices because his allegations of harm amount to nothing more than a subjective chill of his right of free speech. Within this ostensibly nonjusticiable category of claims, the defendants group the following: the use of informers and agents to monitor Jabara's public and private political speeches and discussions; the physical surveillance of Jabara's visible activities on three occasions; interviews with Jabara's neighbors; and the dissemination of information obtained by these means.

The major dispute between the parties with respect to the issue of justiciability is the interpretation to be given to the Supreme Court decision in *Laird v. Tatum,* 408 U.S. 1, 92 S.Ct. 2318, 33 L.Ed.2d 154 (1972). In *Tatum,* the plaintiffs alleged that the United States Army violated their first amendment rights through a program of domestic surveillance. The conduct complained of was part of a system of domestic intelligence collection undertaken by the Army to help it identify possible future civil disorders. The system consisted of the collection of information about public activities thought to have some potential for civil disorder, the reporting of that information to Army Intelligence Headquarters, the dissemination of these reports from headquarters to major Army posts around the country, and the storage of this information in a computer data bank. Much of the information was collected from the news media, but some of it was obtained from civilian law enforcement agencies and Army agents who attended public meetings.

The Supreme Court held that the plaintiffs' allegations regarding this system of data collection failed to present a justiciable controversy because the only harm alleged by the plaintiffs was a "subjective chill" on their first amendment right of free speech. The Court distinguished the plaintiffs' allegations from the facts in other cases involving a First Amendment chill by noting:

In recent years this Court has found in a number of cases that constitutional violations may arise from the deterrent, or "chilling," effect of governmental regulations that fall short of a direct prohibition against the exercise of First Amendment rights. *E. g., Baird v. State Bar of Arizona,* 401 U.S. 1, 91 S.Ct. 702, 27 L.Ed.2d 639 (1971); *Keyishian v. Board of Regents,* 385 U.S. 589, 87 S.Ct. 675, 17 L.Ed.2d 629 (1967); *Lamont v. Postmaster General,* 381 U.S. 301, 85 S.Ct. 1493, 14 L.Ed.2d 398 (1965); *Baggett v. Bullitt,* 377 U.S. 360, 84 S.Ct. 1316, 12 L.Ed.2d 377 (1964). In none of these cases, however, did the chilling effect arise merely from the individual's knowledge that a governmental agency was engaged in certain activities or from the individual's concomitant fear that, armed with the fruits of

those activities, the agency might in the future take some *other* and additional action detrimental to that individual. Rather, in each of these cases, the challenged exercise of governmental power was regulatory, proscriptive, or compulsory in nature, and the complainant was either presently or prospectively subject to the regulations, proscriptions, or compulsions that he was challenging. *Id.* at 11, 92 S.Ct. at 2324–2325.

After noting that the plaintiff's allegations could be labeled as a disagreement with the Executive Branch and that the chill alleged resulted from some "speculative apprehension" that the information obtained would be used against them in the future, the Court held that these "[a]llegations of a subjective 'chill' are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm." *Id.* at 14, 92 S.Ct. at 2325–2326.

The defendants rely on *Tatum* and subsequent decisions to support their contention that several of Jabara's claims are nonjusticiable. It is true that *Tatum* and some lower courts have failed to find a justiciable issue in claims for relief similar to those presented by Jabara. Clearly *Tatum* forecloses the possibility of a justiciable subjective chill arising from a general system of public surveillance, data gathering and dissemination, absent some sort of harassment. Cases following *Tatum* have found similar claims to be nonjusticiable. In *Donohoe v. Duling,* 465 F.2d 196 (4th Cir. 1972), the Court found no justiciable controversy where police conducted surveillance of demonstrations and public vigils and made and retained photographs of the demonstrators. In *Fifth Avenue Peace Parade Committee v. Gray,* 480 F.2d 326 (2nd Cir. 1973), the Court failed to find a justiciable controversy where the FBI had obtained records from a bank and a bus company in order to determine the identity and number of persons planning to attend a demonstration.

Finally, in *Philadelphia Yearly Meeting of the Religious Society of Friends v. Tate,* 519 F.2d 1335 (3rd Cir. 1975), the Court found no justiciable controversy existed with respect to the plaintiffs' claims that their first amendment rights had been chilled by police activities consisting of photography and data gathering at public meetings and the dissemination of this information to other law enforcement agencies.[2]

Despite these cases relied on by the defendants, the Court is of the opinion that Jabara has presented a justiciable first amendment claim. His allegations of a system of independently unlawful intrusions into his life as the result of his lawfully held and lawfully expressed political views is sufficient to take the chilling effect which he alleges outside the realm of speculation and subjectivity. Unlike *Tatum* this is not a case where the plaintiff is attacking a general system of intelligence gathering. Nor can the Court say that, as in *Tatum,* the chill alleged by Jabara results from the mere knowledge that he is being investigated.

The plaintiff alleges that not only has he felt fear at expressing his political views, but that others have been detered from associating with him because of the FBI investigation. Not only this, but the plaintiff alleges that false and misleading reports of his activities have been accumulated by the FBI and disseminated to other federal agencies and foreign governments. In addition, Jabara has alleged injury to his reputation and legal business as the result of publicity surrounding the FBI investigation of him.

Case law supports the proposition that allegations such as the ones set forth in this case present a justiciable controversy. For example, in *Berlin Democratic Club v. Rumsfeld,* 410 F.Supp. 144 (D.D.C.1976), the Court stated:

> This Court agrees that actions beyond "legitimate surveillance activities" are a

---

**2.** Despite this, the Court found that the plaintiffs had alleged sufficient harm as a result of the defendants' failure to restrict disclosure of the information in their possession to police groups and their actual disclosure on national television of the names of the plaintiff organizations and certain of the individual plaintiffs as subjects of police dossiers.

proper subject of challenge. Thus, while collection and retention of information, if collected in a legal manner, cannot be challenged, public dissemination of that information in a false or defamatory manner and with no lawful purpose, disruption of legitimate activities, termination of employment, illegal electronic surveillance, and other forms of harassment are subject to challenge as beyond "legitimate surveillance activities." Moreover, even legitimate surveillance activities, if undertaken in conjunction with illegitimate activities in a manner which raises the inference that the motive was intimidation or coercion, would be subject to challenge. Cf. *Allee v. Medrano,* 416 U.S. 802, 812, 94 S.Ct. 2191, 2198, 40 L.Ed.2d 566, 578 (1974); *United States v. McLeod,* 385 F.2d 734, 750 (5th Cir. 1967); *Lankford v. Gelson,* 364 F.2d 197 (4th Cir. 1966). Even a cursory reading of the acts alleged in the complaint raises a sufficient inference to render this action justiciable. *Id.* at 151.

See also *Alliance to End Repression v. Rochford,* 407 F.Supp. 115 (N.D.Ill.1975) (*Tatum* found inapposite where the plaintiffs alleged that "they were specific objects of both overt and covert surveillance on the part of the defendants"); *Paton v. La Prade,* 524 F.2d 862 (3rd Cir. 1975) (sufficient allegation of harm by a high school student whose future job opportunities were threatened by FBI maintenance of a file on her).

Similarly, in *Socialist Workers Party v. Attorney General,* 419 U.S. 1314, 95 S.Ct. 425, 42 L.Ed.2d 627 (1974) (Marshall, Circuit Justice), Justice Marshall, in ruling on an application to stay an order entered by the Court of Appeals for the Second Circuit, cautioned against an overbroad application of *Tatum* to cases where the alleged chill is specific. In *Socialist Workers Party,* the plaintiffs challenged the FBI's intention to infiltrate the national convention of the Young Socialist Alliance on the ground that it would dissuade members from attending and would impede the exercise of free speech by those in attendance. Although Justice Marshall resolved the motion for a stay in favor of the government, he rejected the contention that the plaintiffs had failed to present a justiciable controversy:

In this case, the allegations are much more specific [than those in *Tatum*]; the applicants have complained that the challenged investigative activity will have the concrete effects of dissuading some YSA delegates from participating actively in the convention and leading to possible loss of employment for those who are identified as being in attendance. Whether the claimed "chill" is substantial or not is still subject to question, but that is a matter to be reached on the merits, not as a threshold jurisdictional question. The specificity of the injury claimed by the applicants is sufficient, under *Laird,* to satisfy the requirements of Art. III. *Id.* at 1314, 95 S.Ct. at 428.

For the reasons set forth above, the Court denies the defendants' motion to dismiss for lack of justiciability.

## IV *CONSTITUTIONAL CLAIMS*

 The Court's conclusion that Jabara has alleged sufficient harm to state a justiciable claim of course does not establish that he is entitled to relief. In order to establish such entitlement Jabara must show that this injury was the result of violations of his constitutional rights. The major constitutional allegations in the complaint are that Jabara's first and fourth amendment rights were violated by the actions of the defendants.[3]

(a) The Fourth Amendment Claims

 It is clear to the Court that many of the investigatory practices employed by the defendants are not violative of fourth amendment law. First, there can be no

---

**3.** The plaintiff has also alleged violations of his Fifth, Sixth and Ninth Amendment rights. The Court will deal with the Sixth Amendment claim later in this opinion. With respect to the claimed violations of the Fifth and Ninth Amendments, the Court is of the opinion that they add nothing to Jabara's other constitutional causes of action and are to be dismissed insofar as they purport to represent independent grounds for relief.

doubt that a person's reasonable expectation of privacy is not violated by physical surveillance in public. *Fifth Avenue Peace Parade Committee v. Gray,* 480 F.2d 326 (2nd Cir. 1973). Nor is the use of informants for surveillance purposes violative of the fourth amendment, without some sort of harassment or incitement to crime. *Hoffa v. United States,* 385 U.S. 293, 87 S.Ct. 408, 17 L.Ed.2d 374 (1966); *Handschu v. Special Services Division,* 349 F.Supp. 766 (S.D.N.Y.1972). Similarly, in *United States v. Miller,* 425 U.S. 435, 96 S.Ct. 1619, 48 L.Ed.2d 71 (1976), the Court held that the government does not violate a criminal defendant's fourth amendment rights when it reviews his bank records. Jabara seeks to distinguish *Miller* on the basis that it involved a criminal investigation. This position is untenable. The *Miller* court held that the documents in question were the business records of the bank and that a customer had no reasonable expectation of privacy therein:

> The depositor takes the risk, in revealing his affairs to another that the information will be conveyed by that person to the Government. This Court has held repeatedly that the Fourth Amendment does not prohibit the obtaining of information revealed to a third party and conveyed by him to Government authorities, even if the information is revealed on the assumption that it will be used only for a limited purpose and the confidence placed in the third party will not be betrayed. 425 U.S. at 443, 96 S.Ct. at 1624.

In light of this broad language, the Court is of the opinion that a distinction based upon the type of investigation involved is without merit. Since Jabara can claim no reasonable expectation of privacy in such records, his fourth amendment rights are not violated by the inspection thereof.

Finally, the Court is of the opinion that the maintenance and dissemination of information gained through practices not violative of the fourth amendment cannot in and of itself violate the fourth amendment.[4]

For the reasons set forth above, the Court grants the defendants' motion to dismiss with respect to all fourth amendment claims based on physical surveillance, the use of informers, the inspection of bank records and the maintenance and dissemination of information obtained through these practices.

**(b) The First Amendment Claims**

Jabara's first amendment claims center around the alleged inhibiting effect that the defendants' activities have had upon his first amendment rights of free speech and association. The defendants argue that the plaintiff is not entitled to judgment upon these claims because the first amendment gives him no greater right against governmental investigatory intrusion than the fourth amendment. Accordingly, the defendants argue that a first amendment cause of action cannot be predicated on investigatory tactics, such as those outlined above, which the Court has held to be nonviolative of fourth amendment rights. The plaintiff, on the other hand, argues that several cases have implicitly recognized that the first amendment affords a person greater substantive rights than the fourth amendment.

There is little authority regarding the relationship between the first and fourth amendments in the context of governmental investigations. The most exhaustive and explicit treatment of the issue is contained in *Reporters Committee for Freedom of the Press, et al., v. American Telephone & Telegraph Co., et al.,* 192 U.S.App.D.C. 376, 593 F.2d 1030 (1978). *Reporters Committee* involved a challenge by several journalists and newspapers to the practice of a telephone company of providing telephone billing records of journalists' calls to government agents investigating possible crimes. The majority of the Court resolved the first and fourth amendment claims against the plaintiff. Circuit Judge Wilkey in his opinion for the Court also discussed

---

**4.** Although the plaintiff alleges that information so disseminated was in some respects false, this fails to state a fourth amendment

cause of action since no independent privacy violation is alleged.

the relationship of the first and fourth amendments.[5] With respect to the plaintiff's fourth amendment claim, Judge Wilkey found the telephone company's action indistinguishable from the examination of bank records, and he therefore found no fourth amendment violation on the authority of *Miller, supra.* Judge Wilkey then held that because there was no fourth amendment violation there could be no first amendment violation.

He described the plaintiff's argument as follows:

> The crux of plaintiffs' argument, then, is that they have a right to establish relationships in secret under circumstances in which the Fourth Amendment ensures no secrecy and that they have a right to engage in furtive action free from investigative scrutiny within an arena ordinarily open to such scrutiny. In short, plaintiffs claim that the zone of privacy guaranteed them by the Fourth and Fifth Amendments does not give them adequate privacy within which to conduct clandestine collection and that they, apart from other citizens, must have a broader zone of privacy. 192 U.S. App.D.C. at 400, 593 F.2d at 1054.

and he posited the issue as follows:

> The question thus presented is this: Does the First Amendment afford plaintiffs this extra margin of privacy by imposing substantive or procedural limitations on *good faith* criminal investigative action above and beyond the limitations imposed by the Fourth and Fifth Amendments:

Judge Wilkey answered this question in the negative:

> In my view, the guarantees of the Fourth and Fifth Amendments achieve their purpose and provide every individual with sufficient protection against good faith investigative action for the full enjoyment of his First Amendment rights of expression. To the extent an individual insists that he must shield himself from the prospect of good faith investigation

and operate in secrecy in order to exercise effectively particular First Amendment liberties, he must find that shield and establish that secrecy within the framework of Fourth and Fifth Amendment protections. This is not to say that the First Amendment never gives rise to any privacy-type interests apart from those secured by the Fourth and Fifth Amendments. It does mean, however, that such interests are overridden in criminal cases by the public's interest in effective law enforcement investigation at least insofar as they go beyond protections already afforded by the Fourth and Fifth Amendments. 192 U.S.App.D.C. at 400, 593 F.2d at 1054.

In reaching this conclusion, Judge Wilkey relied on a long line of cases involving varying fact situations. He placed principal reliance on *Zurcher v. Stanford Daily,* 436 U.S. 547, 98 S.Ct. 1970, 56 L.Ed.2d 525 (1978), where police had searched the offices of a college newspaper pursuant to a valid search warrant. The District Court granted the plaintiff journalists' request for declaratory relief based on their argument that the first amendment required that evidence in a newspaper's possession be obtained by a subpoena *duces tecum* rather than by a search warrant unless police make a clear showing that the evidence would otherwise be destroyed. The Court, after admitting that first amendment values were implicated, in effect dismissed any notion that the first amendment provided additional protection beyond that accorded by the fourth amendment in such circumstances:

> Neither the Fourth Amendment nor the cases requiring consideration of First Amendment values in issuing search warrants, however, call for imposing the regime ordered by the District Court. Aware of the long struggle between Crown and press and desiring to curb unjustified official intrusions, the Framers took the enormously important step

---

**5.** This discussion was not joined in by the other judges on the panel and was not necessary to disposition of the case.

of subjecting searches to the test of reasonableness and to the general rule requiring search warrants issued by neutral magistrates. They nevertheless did not forbid warrants where the press was involved, did not require special showings that subpoenas would be impractical, and did not insist that the owner of the place to be searched, if connected with the press, must be shown to be implicated in the offense being investigated. Further, the prior cases do not more than insist that the courts apply the warrant requirements with particular exactitude when First Amendment interests would be endangered by the search. As we see it, no more than this is required where the warrant requested is for the seizure of criminal evidence reasonably believed to be on the premises occupied by a newspaper. Properly administered, the preconditions for a warrant—probable cause, specificity with respect to the place to be searched and the things to be seized, and overall reasonableness—should afford sufficient protection against the harms that are assertedly threatened by warrants for searching newspaper offices. *Id.* at 565, 98 S.Ct. at 1981, 1982.

As further support for his conclusion, Judge Wilkey cites several cases dealing with mail covers, the use of informants and physical surveillance, all of which tend to indicate by way of implication that a good faith criminal investigation which does not tread on fourth amendment rights does not violate the first amendment. See 593 F.2d at 1056–1058.

In support of their contention that the first and fourth amendments are coextensive in the context of a legitimate investigation, the defendants also rely on *Sinclair v. Kleindienst,* No. 610–73 (D.D.C. Sept. 23, 1977), where the plaintiff challenged warrantless electronic surveillance of his telephone communications as authorized by the Attorney General. In addition to the alleged violations of their fourth amendment rights, the plaintiffs also alleged violations of the first, ninth and fifth amendments. Although the Court held that these alleged violations would be relevant to the issue of damages, it concluded that they did not provide an independent basis for recovery:

> These allegations are necessarily intertwined with the reasonableness of the wiretaps and the good faith belief of the defendants in the legality of their conduct, issues which were raised in the first cause of action and which remain in the case. Therefore, these causes of action must succeed or fail as the first cause of action succeeds or fails. To the extent they are not independent bases for recovery, they are dismissed. These issues remain in the case, however, for if plaintiffs prove the wiretaps were unreasonable and the defendants acted in bad faith, they will be permitted to show any chill on their first amendment rights, invasion of their privacy, or their subjection to a bad faith prosecution in order to determine the measure of damages to which they would be entitled. Slip Op. at 11.

■ The Court is convinced that the analysis of Judge Wilkey and that followed by the Court in *Sinclair* is correct insofar as it sets forth the legal principle that the first amendment and the fourth amendment provide coextensive zones of privacy in the context of a good faith criminal investigation. Furthermore, the Court believes that this principle applies with equal force to good faith national security investigations which are not strictly criminal in nature. Any holding otherwise would clearly place an insurmountable burden on any good faith investigation. Almost any investigation, no matter how nonintrusive, will implicate some first amendment rights. Physical surveillance, the use of informers and discussions with other persons about the subject will necessarily reveal some of the subject's associations, beliefs, expressions and communications of all kinds. To tailor investigations so as to avoid implicating a subject's first amendment activities would be impossible. This is especially true when one considers the varied and common forms of speech which receive first amendment protection.

The Court is unpersuaded by the plaintiff's argument that the principle of coextensive first and fourth amendment protection in the context of a good faith investigation is refuted by a number of cases which have upheld the justiciability of first amendment claims without a discussion of relevant fourth amendment principles. Aside from the fact that the issue now before the Court is different from those decided in the cases relied on by the plaintiff, the Court is of the opinion that these cases for the most part support, rather than refute, the proposition that in the context of a good faith investigation, the privacy protections guaranteed by the first and fourth amendments are coextensive.

Nearly all of the cases relied on by Jabara mention an allegedly illegitimate investigatory motive or illegitimate investigatory practices as part of the basis for their decision. For example, in *Philadelphia Yearly Meeting of the Religious Society of Friends v. Tate,* 519 F.2d 1335, 1338–39 (3rd Cir. 1975), the Court stated:

> It is not apparent how making information concerning the lawful activities of plaintiffs available to non-police groups or individuals could be considered within the *proper ambit of law enforcement activity* . . . . We think plaintiff's allegations of specific identification of most of the plaintiffs in the television broadcast *when joined with the absence of a lawful purpose,* make an adequate showing, for pleading purposes, of an invasion of plaintiffs' rights to *associational privacy* and freedom of speech (emphasis supplied).

And in *Berlin Democratic Club v. Rumsfeld,* 410 F.Supp. 144, 151 (D.D.C.1976), the Court stated:

> This Court agrees that actions beyond "legitimate surveillance activities" are a

proper subject of challenge. Thus, while collection and retention of information, if collected in a legal manner, cannot be challenged, public dissemination of that information in a false or defamatory manner and with no lawful purpose, disruption of legitimate activities, termination of employment, illegal electronic surveillance, and other forms of harassment are subject to challenge as beyond "legitimate surveillance activities." Moreover, even legitimate surveillance activities, if undertaken in conjunction with illegitimate activities in a manner which raises the inference that the motive was intimidation or coercion, would be subject to challenge.

See also *Handschu v. Special Services Division,* 349 F.Supp. 766, 771 (S.D.N.Y.1972). ("A hearing may establish that some of the alleged informer and infiltration activities are unrelated to legitimate law enforcement functions.") *Fifth Avenue Peace Parade Committee v. Gray,* 480 F.2d 326, 332 (2nd Cir. 1973) ("Beyond any reasonable doubt the FBI had a legitimate interest in and responsibility for the maintenance of public safety and order . . .")[6]

The only case to suggest a contrary result is *Paton v. LaPrade,* 469 F.Supp. 773 (D.N.J.1978), where the plaintiff alleged a first amendment violation when the return address of her letter to the Socialist Workers Party was recorded by the FBI, pursuant to a mail cover placed on the addressee. The plaintiff had intended to direct this letter to the Socialist Labor Party as part of an assignment for a high school social studies course. Although the Court found that the plaintiff's fourth amendment rights were not violated by the mail cover, the Court held that the postal regulation authorizing mail covers for national security purposes was so vague and overbroad that it violated the first amendment.

---

**6.** Other cases relied on by Jabara, although not referring to illegitimate conduct specifically, clearly involved allegations of police activity outside the scope of legitimate investigatory tactics. See *American Civil Liberties U. v. City of Chicago,* 431 F.Supp. 25 (1976) (physical attacks and disruption of sources of financial support); *Alliance to End Repression v. Roch-* ford, 407 F.Supp. 115 (N.D.Ill.1975) (incitement to commit unlawful acts, warrantless electronic surveillance, illegal search and seizure, and summary punishment and harassment); *Philadelphia Resistance v. Mitchell,* 58 F.R.D. 139 (E.D.Pa.1972) (physical violence, threats, illegal searches and seizures, illegal electronic surveillance and denial of the right to counsel).

Although on the surface *Paton* appears to stand for the proposition that the first amendment gives one a greater protection from good faith investigatory practices than the fourth amendment, a closer examination discloses that the decision in *Paton* was a narrow one and that it, in fact, supports the proposition previously adopted by this Court. In essence, the Court in *Paton* held that the term "national security" as used in the Postal Regulation was so vague and overbroad that to sanction mail covers in its name would lead to abuses and would, in fact, permit mail covers to be employed by public officials "to pursue their personal predilections." Thus, the Court did not find that a mail cover which was imposed because of legitimate national security concerns was invalid. Rather, it found a regulation permitting both legitimate and illegitimate mail covers to be unconstitutional.

There is no indication that the *Paton* court, if faced with a decision not involving the constitutionality of a statute or regulation would have held that the zone of privacy guaranteed by the first amendment exceeds that provided by the fourth amendment in an objectively legitimate national security investigation. In fact, the Court specifically recognized that mail covers were legitimate in the context of a valid *criminal* investigation. Thus, it is clear to this Court that *Paton* did not question the proposition that first amendment privacy rights must yield in the face of a good faith investigation; instead, it held that a statute which did not distinguish between legitimate and illegitimate national security investigations was invalid.

▉ It is clear from the above that the crucial issue with respect to investigatory practices under consideration in this section of the opinion is whether the FBI's investi-

gatory conduct can be termed a good faith national security investigation.[7] From the evidence presented both in the public record and in the *in camera* affidavits, the Court concludes that genuine issues of material fact exist with respect to this issue, and that the summary judgment motions of both the plaintiff and defendants must be denied. In its earlier opinions in this case the Court has alluded to the merits of the investigation. For example, a 1974 opinion concerning discovery matters stated "the court is of the opinion that the investigation which the defendants admit they were[8] conducting was conducted pursuant to legitimate governmental concerns." *Jabara v. Kelley,* 62 F.R.D. 424, 431 (E.D.Mich. 1974). However, in a 1977 opinion, again regarding discovery matters, the Court stated that "its *in camera* review has not revealed any evidence to establish that the plaintiff or the domestic organization to which he belongs has been implicated in any way with a foreign agent or organization of or acting in collaboration with a foreign power." *Jabara v. Kelley,* 75 F.R.D. 475, 493 (E.D.Mich.1977). These passages do not reflect inconsistent findings but merely indicate the varying inferences which can be drawn both from the *in camera* submissions and the public record in the case. On the one hand, the *in camera* affidavits tend to indicate that a generalized and legitimate government concern provided the impetus for the investigation. On the other hand, the length of the investigation, its seeming preoccupation with Jabara's political views, the fact that in many instances Jabara was encouraging other Arabs to mount legal challenges to FBI investigations and the failure of the investigation to uncover any concrete evidence that Jabara's activities implicated national security along with other factors tend to indicate that the investigation was not wholly prompted by legiti-

7. The Court will not at this time attempt a precise definition of this term. However, in the Court's opinion, a "good faith national security investigation" suggests more than a subjective perception of a threat to the national security— it suggests an investigation which is in response to a demonstrable threat to the nation or its citizens and which is calculated to deal with or provide information regarding that threat.

8. In view of the defendants' admission that the investigation continued until at least December, 1975, the use of the past tense appears to have been inappropriate.

mate or good faith national security concerns. As a result, the Court is of the opinion that it can grant neither Jabara's nor the defendants' motion for summary judgment with respect to the plaintiff's first amendment claim on the basis of the record as it now stands.

The Court realizes that this decision places the future course of this litigation in some doubt. It may well be that a public trial on the nature of the FBI's investigation will be impossible because of national security considerations. However, the Court cannot take such considerations into account when deciding a motion for summary judgment. The Court is bound to grant such relief only when no genuine issue of material fact exists. Given the nature of the record in this case, the Court must conclude that a genuine issue regarding the motives and legitimacy of the Jabara investigation exists, the resolution of which requires a fact finder.

**(c) The Sixth Amendment Claim**

■ As part of his fourth cause of action, the plaintiff alleges that the sixth amendment rights of his clients were violated by the interception of telephone communications between himself and said clients. The Court is of the opinion that this portion of Jabara's complaint must be dismissed pursuant to F.R.C.P. 12(b)(6) because it fails to state a claim upon which relief can be granted. Manifestly, the rights guaranteed by the sixth amendment are those of the client and not the attorney. Therefore, assuming that a sixth amendment violation can be asserted on the facts of this case,[9] only the client has standing to assert a violation of his sixth amendment rights. In this case, Jabara, even as an attorney, lacks sufficient standing to assert violations of his clients' rights to counsel as a personal cause of action. For this reason, the plaintiff's sixth amendment claim must be dismissed.

## V *ELECTRONIC SURVEILLANCE BY THE FBI*

The defendants have also moved for a summary judgment with respect to the plaintiff's constitutional and statutory claims arising out of the FBI's incidental interception of Jabara's conversations with individuals who were the target of FBI wiretaps.[10] The plaintiff's complaint alleges that this conduct violated the fourth amendment and Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510–2520. The Court is of the opinion that the defendants' motion is to be granted with respect to these claims.

■ First, it is clear that the plaintiff's theory of recovery cannot be based on the provisions of Title III. Although Title III requires a warrant for certain types of electronic surveillance, it did not legislate with respect to the President's power to authorize electronic surveillance with respect to matters of national security. 18 U.S.C. § 2511(3). In *United States v. United States Court (Keith)*, 407 U.S. 297, 92 S.Ct. 2125, 32 L.Ed.2d 752 (1972), the Supreme Court held that clear language of Title III reveals that it did not legislate with respect to national security surveillances and that such surveillances therefore are not subject to the warrant requirements contained in 18 U.S.C. § 2518. *Accord, Hallinan v. Mitchell*, 418 F.Supp. 1056 (N.D.Cal.1976). However, in *Zweibon v. Mitchell*, 170 U.S. App.D.C. 1, 516 F.2d 594 (1975), (*en banc*), a plurality of the Court held that Title III was applicable to any situation where a warrant was constitutionally required for electronic surveillance. In other words, the Court recognized that while Title III does not legislate with respect to the necessity of obtaining a warrant for national security wiretaps, it does provide procedures and remedies applicable to any national security wiretap where a warrant is otherwise required by the constitution.

---

**9.** The decision in *Moro v. Telemundo Incorporado*, 387 F.Supp. 920 (D.Puerto Rico 1974), casts doubt on the validity of such an assumption.

**10.** The plaintiff had admitted in his brief in support of his motion for summary judgment that the record does not support a finding of prima facie illegal electronic surveillance.

Thus, even considering *Zweibon,* it is clear that Title III does not in and of itself require a warrant for national security investigations. As a result, the issue which must be resolved is whether there is a constitutional basis, aside from Title III, which requires a warrant for electronic surveillance such as that conducted in this case. In *Keith,* the Court held that a warrant was constitutionally required for domestic national security wiretaps. However, the Court specifically left open the issue of whether a warrant is required for a foreign national security wiretap:

> As stated at the outset, this case involves only the domestic aspects of national security. We have not addressed, and express no opinion as to the issues which may be involved with respect to the activities of foreign powers or their agents. 407 U.S. at 321–22, 92 S.Ct. at 2139.

Courts considering the question left open in *Keith* have almost unanimously held that a warrant is not required for a foreign national security surveillance:

> [B]ecause of the President's constitutional duty to act for the United States in the field of foreign relations, and his inherent power to protect national security in the context of foreign affairs, we reaffirm what we held in *United States v. Clay,* [430 F.2d 165 (5th Cir. 1970), rev'd on other grounds 403 U.S. 698, 91 S.Ct. 2068, 29 L.Ed.2d 810 (1970)], that the President may constitutionally authorize warrantless wiretaps for the purpose of gathering foreign intelligence.
>
> *United States v. Brown,* 484 F.2d 418, 426 (5th Cir. 1973).

*Accord, United States v. Butenko,* 494 F.2d 593 (3rd Cir. 1974) (*en banc*), *cert. denied,* 419 U.S. 881, 95 S.Ct. 147, 42 L.Ed.2d 121 (1974); *United States v. Smith,* 321 F.Supp. 424 (C.D.Cal.1971); *United States v. Humphrey,* 456 F.Supp. 51 (E.D.Va.1978).

The only case questioning this proposition is *Zweibon v. Mitchell, supra,* involving electronic surveillance of the Jewish Defense League. The *Zweibon* plurality voiced its disapproval of the decisions in *Brown* and *Butenko* and expressed a belief that a warrant is required for both domestic and foreign national security electronic surveillances. Despite this, the plurality opinion did not go so far as to hold that a warrant was required for all foreign intelligence surveillances:

> the President's authority with respect to the conduct of foreign affairs does not excuse him from seeking judicial approval before instituting a surveillance, at least where the subject of the surveillance is a domestic organization that is not the agent of or acting in collaboration with a foreign power. *Id.* 170 U.S.App. D.C. at 62, 516 F.2d at 655.

In light of these decisions, the Court is of the opinion that a warrant is not required for foreign intelligence electronic surveillances authorized by the President where the target of the surveillance is an agent of or acting in collaboration with a foreign power.

Applying this holding to the instant case, the Court concludes that a warrant was not required for the FBI wiretaps in question. In an earlier opinion, the Court found that the subjects of these surveillances were associated with a foreign-based international terrorist movement. *Jabara v. Kelley,* 75 F.R.D. at 489. In addition, the Court has carefully reviewed the *in camera* affidavit of FBI Special Agent Robert F. Peterson regarding the targets of the FBI wiretaps at issue. Based on the facts set forth in this affidavit, it would be impossible to conclude that the surveillance in question was not primarily for foreign intelligence purposes. Nor would it be possible to conclude that the subjects of these surveillances were not agents or collaborators of a foreign power. Therefore, on the authority of the above cited cases, the Court holds that prior judicial approval in the form of a warrant was not required for the surveillances in question. In addition, the Court's finding that the wiretaps in question were primarily for foreign intelligence purposes forecloses any possibility of a post-interception judicial finding that the electronic surveillances in question were unreasonable. *United States v. Butenko,* 494

F.2d 593 (3rd Cir. 1974). Accordingly, the Court grants the defendants' motion for summary judgment with respect to those claims concerning the reasonableness of the FBI's interceptions as well as those claims based on the failure to procure a warrant for such interceptions.

## VI NSA SURVEILLANCE

During the course of its investigation of Jabara, the FBI requested the National Security Agency to supply any available information regarding the plaintiff that might come into its possession. Pursuant to this request, summaries of Jabara's electronically intercepted communications were forwarded by NSA to the FBI. Two of these communications were used as leads and the FBI disclosed their contents outside the Bureau in order to identify and obtain a document referred to in one of the communications and to confirm Jabara's travel plans as discussed in another communication.

Based on this record, the plaintiff maintains that he is entitled to declaratory and injunctive relief with respect to these warrantless electronic surveillances because they violate his constitutional and statutory rights. The defendants, on the other hand, have moved for dismissal of this cause of action for want of proof, arguing that the evidence required to litigate this issue is covered by the state secrets privilege. This contention is based on the fact that the Court has upheld claims of privilege with respect to the method of interception employed by NSA and the contents of the communications intercepted.

Before reaching the merits of these contentions, it is important to distinguish the NSA intercepts from the incidental interceptions by the FBI discussed earlier. First, while it is not clear that Jabara was the target of the NSA interceptions, it is apparent that the FBI specifically requested summaries of Jabara's foreign communications. Thus, at least with respect to the examination and disclosure of these summaries, the conduct of NSA and the FBI was not incidental to the investigation of non-parties. Second, while the Court cannot say

with any certainty whether the interceptions in question were conducted pursuant to the investigation of an agent or collaborator of a foreign power, there is no evidence that Jabara's communications were targeted by the FBI for examination because of the identity of the other party. In other words, while the impetus for the interceptions in question remains unclear, the record, including the *in camera* affidavits, does not disclose any reason for the targeting and examination of these communications other than the fact that Jabara was a party to them.

The primary issue, therefore, is whether this factual background establishes a case of illegal electronic surveillance or whether the claim must be dismissed because its proof would involve the disclosure of information guarded by the state secrets privilege. In support of their position that the claim must be dismissed, the defendants rely on *Halkin v. Helms*, No. 75–1773 (D.D.C. June 30, 1977) aff'd in part and rev'd in part, 194 U.S.App.D.C. 82, 598 F.2d 1 (1978), where the plaintiffs sought relief for allegedly unlawful electronic surveillance activities conducted by NSA. In response to NSA's motion, the District Court dismissed the complaint of Halkin et al. with respect to certain interceptions holding that national security considerations precluded disclosure of whether the alleged interceptions had in fact taken place. With respect to certain other alleged interceptions, the Court held that the national security would not be compromised by requiring NSA to disclose whether or not these interceptions occurred.

On appeal, the Circuit Court of Appeals for the District of Columbia affirmed the District Court's dismissal with respect to the first group of interceptions. The Court of Appeals reversed with respect to the second group of alleged interceptions, holding that even disclosure of the fact of interception would jeopardize the national security. See also *Totten v. United States*, 92 U.S. 105, 23 L.Ed. 605 (1875); *Kinoy v. Mitchell*, 67 F.R.D. 1 (S.D.N.Y.1975).

Although the Court agrees with the general proposition that an action should be dismissed if its proof would disclose state secrets, this case is clearly different from *Halkin*. In *Halkin* the District Court dismissed certain allegations "because the threshold and ultimate issue—the fact of interception—cannot be admitted or denied." Slip Op. at 5. In this case, that threshold and ultimate issue is an admitted fact. There is no question that summaries of several of the plaintiff's conversations were obtained by the FBI from NSA. This, the plaintiff argues, entitles him to the relief sought because there was no prior judicial approval.

The Court is of the opinion that resort need not be made to privileged material to establish a violation of the plaintiff's constitutional rights and that the plaintiff is entitled to a judgment with respect to the defendants' liability as to this issue. The defendants' contention that the technique used to intercept Jabara's communications somehow poses questions of whether the fourth amendment is applicable has no merit whatsoever. Long ago the Supreme Court recognized that "the Fourth Amendment protects people not places" and that the method of intrusion has no bearing on the protection afforded by that amendment[11] when the intrusion is made into an area where there is a reasonable expectation of privacy. *Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). In light of *Katz*, the Court cannot give credence to the defendants' assertion that "the methodology described by paragraph 5(b) [of the *in camera* affidavit of Secretary of Defense Harold Brown] alone suggests on its face . . . that the very applicability of the Fourth Amendment is arguably not at issue." Defendants' Brief at 22.

From the Court's review of Secretary Brown's affidavit, it is apparent that the fact that Jabara's communications were intercepted in the ways described without more may present a question of whether his privacy has been violated. In this case, however, not only is interception an admitted fact, but it is also admitted that Jabara's intercepted communications were targeted for transmission to and examination by the FBI. Based upon these admissions, it is impossible for the Court to conclude that the fourth amendment has not been violated.

The defendants do not and could not contend that Jabara has no reasonable expectation of privacy in his foreign communications. In addition, the defendants cannot rationally argue that the interception of these communications, when coupled with the transmission of summaries of their contents, did not violate this privacy. Thus, the only question which must be resolved is whether the procedure is immune from the warrant requirement.

In their brief the defendants argue that: Plaintiff's presumption that communications to which he was a party were not acquired as a result of surveillance on an agent of a foreign power is totally unsupported by the record. Communications have both a sender and a recipient. Plaintiff apparently overlooks the possibility that the party to his communication, or some other aspect of its content, may have been the actual object of surveillance and not the plaintiff himself. Defendants' Brief at 22.

If, in fact, the object of the surveillance in question was an agent or collaborator of a foreign power, it is arguable that a warrant would not have been required for interception. See Part V, *supra*. Despite this, the defendants' argument overlooks the fact that the FBI requested NSA to supply the Bureau with any information about Jabara which came into NSA's possession in the course of its foreign intelligence activities. Thus, while the impetus for intercepting

11. "[O]nce it is recognized that the Fourth Amendment protects people—and not simply "areas"—against unreasonable searches and seizures it becomes clear that the reach of that amendment cannot turn upon the presence or absence of a physical intrusion into any given enclosure. . . . The fact that the electronic device employed to achieve that end did not happen to penetrate the wall of the booth can have no constitutional significance." *Katz v. United States*, 389 U.S. 347, 353, 88 S.Ct. 507, 512, 19 L.Ed.2d 576 (1967).

the communications in question may not have been Jabara's activities, Jabara clearly was the target of this intelligence activity insofar as it was the FBI's request which caused Jabara's communications to be targeted for transmission to and examination by the Bureau. This, the Court believes, is a clear violation of Jabara's fourth amendment rights regardless of whether he or an agent or collaborator of a foreign power was the target of the surveillance.[12] Therefore, the Court is of the opinion that the defendants have failed to produce and could not produce any evidence which would establish that the transmission and examination of Jabara's communications was subject to the foreign agent or collaborator exception to the warrant requirement.

Furthermore, any contention that a warrantless search directed at Jabara can be justified by the plaintiff's affiliations must fail in light of the Court's earlier finding "that its *in camera* review [of materials submitted by the government] has not revealed any evidence to establish that the plaintiff or the domestic organization to which he belongs has been implicated in any way with a foreign agent or organization or acting in collaboration with a foreign power." *Jabara v. Kelley*, 75 F.R.D. at 493.

██ Thus, it is clear to the Court that a fourth amendment violation has occurred. As noted above, the mode of interception employed by NSA does involve serious fourth amendment questions with respect to whether NSA surveillance *alone* violates a person's reasonable expectations of privacy and is subject to the warrant requirement of the fourth amendment. However, the examination of the contents of conversations thus intercepted would violate a

person's reasonable expectation of privacy[13] and is tantamount to what has generally been referred to as an interception in cases and statutes dealing with more traditional modes of electronic surveillance. Consequently, absent some recognized exception to the warrant requirement, the targeting of a person's conversations intercepted by NSA for summarization, transmission to, and subsequent examination by other agencies must be done pursuant to prior judicial authorization akin to a warrant. Here no such exception exists. Jabara has not been shown to be an agent or collaborator of a foreign power and even if it were shown that such an agent or collaborator was the other party to Jabara's intercepted communications, that circumstance would be irrelevant to the warrant requirement. Since the FBI's interest in Jabara led to the transmission and examination of the summaries in question, any applicable exception to the warrant requirement must be based on Jabara's status or identity.

Accordingly, the plaintiff's motion for summary judgment with respect to this issue is granted. In view of the fact that Title III remedies apply to any interception requiring a warrant, see *Zweibon, supra,* the Court need not decide whether Title III was in fact violated in view of its holding that the constitution requires a warrant in these circumstances.[14]

## VII THE PRIVACY ACT

██ The plaintiff's eighth cause of action alleges that the defendants have violated certain provisions of the Privacy Act, 5 U.S.C. §§ 552a(e)(1) and (7), by maintaining records regarding how Jabara exercises his first amendment rights.[15] As a remedy for

---

**12.** There is nothing in the record to suggest that any impetus for the transmission and subsequent examination of these summaries existed other than the fact that Jabara was a participant in the communications.

**13.** This is especially true in this case where at least two of the communications in question were used for investigative lead purposes by the FBI.

**14.** From the *in camera* affidavits it appears that Title III would not provide a separate ground for requiring a warrant in this case in view of the Supreme Court's holding in *Keith* that national security surveillance conducted pursuant to executive order is not within the ambit of Title III.

**15.** In his brief, Jabara alleges that the defendants have violated other sections of the Privacy

these alleged violations, Jabara asks the Court to order the destruction of "all records or other materials of any kind maintained by them concerning the constitutionality [sic] protected activities of the plaintiff." Plaintiff's Second Amended Complaint at 4.

First, the Court is of the opinion that the plaintiff has alleged sufficient harm to maintain an action for relief under the Privacy Act. Section 552a(g)(1) provides in part:

Whenever any agency . . . fails to comply with any other provisions of this section, or any rule promulgated thereunder, in such a way as to have an adverse effect on an individual . . . the individual may bring a civil action against the agency, and the district courts of the United States shall have jurisdiction in the matters under the provisions of this subsection.

The breadth of this grant of jurisdictional authority is evident from the Senate Report accompanying an earlier version of the Privacy Act:

. . . The grant of a cause of action to any "aggrieved person" is designed to encourage the widest possible citizen enforcement through the judicial process. This is necessary, as mentioned, since the Act does not give any administrative body authority to ensure compliance with the Act. The Committee intends the use of the term "aggrieved person" to afford the widest possible standing consistent with the constitutional requirement of "case or controversy" in Article III, Sec. 2 of the Constitution. In this respect, the provision is designed, among other things, to supply certain deficiencies in standing and ripeness which the courts found in the *Environmental Protection Agency v. Mink*, 410 U.S. 73, 93 S.Ct. 827, 35 L.Ed.2d 119 (1973), *Laird v. Tatum*, 408 U.S. 1, 92 S.Ct. 2318, 33 L.Ed.2d 154 (1972) and *Stark v. Shultz*, 416 U.S. 21, 94 S.Ct. 1494, 39 L.Ed.2d 812 (1974). 1974 U.S.Code Cong. & Admin.News, pp. 6916, 6997.

In view of the plaintiff's aforementioned allegations of harm, including his allegations regarding the falsity of data contained in the FBI files, the Court concludes that he has alleged sufficient harm to permit him to maintain this action under the Privacy Act.

Turning to the merits of Jabara's Privacy Act claims, Section 552a(e)(1) provides that an agency may:

maintain in its records only such information about an individual as is relevant and necessary to accomplish a purpose of the agency required to be accomplished by statute or by executive order of the President.

In view of the fact that the violation alleged in the plaintiff's eighth cause of action appears to relate only to § 552a(e)(7) and since the plaintiff's brief fails to mention § 552a(e)(1) as a ground for recovery, the Court is of the opinion that the alleged violation of § 552a(e)(7) is the only Privacy Act allegation properly before the Court and that the § 552a(e)(1) claim is to be dismissed.

With respect to the alleged violation of § 552a(e)(7) the Court is of the opinion that there is no genuine issue of material fact and that Jabara is entitled to judgment on his claim that the defendants' maintenance of records violates that provision of the Privacy Act. Section 552a(e)(7) provides that an agency shall:

Maintain no record describing how any individual exercises rights guaranteed by the First Amendment unless expressly authorized by statute or by the individual about whom the record is maintained or unless pertinent to and within the scope of an authorized law enforcement activity.

It is undisputed that the defendant FBI has made, maintained and transmitted records regarding Jabara's expression of his political views in public and private speeches. Although the defendants do not

---

Act, *to wit*: 5 U.S.C. § 552a(e)(6), regarding the accuracy of records, and 5 U.S.C. § 552a(b), regarding the transfer of information. Since

neither of these allegations are set forth in the complaint, the Court will not consider them on this motion.

contend there is a specific statute authorizing them to maintain such records, they do contend that the maintenance of such records is "pertinent to and within the scope of an authorized law enforcement activity."

Unfortunately, the term "authorized law enforcement activity" is not defined in the Privacy Act. There are, however, portions of the legislative history of the Act which shed some light on the scope of this term. The original Senate Bill upon which the Privacy Act was based contained various exceptions for records which were referred to as "investigative information" and "law enforcement intelligence information." As used in the original bill, these terms were defined as follows:

The term "investigative information" has a special and narrow meaning under this bill. It has been discussed at length in the section of the report entitled "Law Enforcement Files". It means information associated with an identifiable individual compiled by—

(1) an agency in the course of conducting a criminal investigation of a specific criminal act where such investigation is pursuant to a statutory function of the agency. Such information may pertain to that criminal act and be derived from reports of informants and investigators, or from any type of surveillance. The term does not include criminal history information nor does it include initial reports filed by a law enforcement agency describing a specific incident, indexed chronologically and expressly required by State or Federal statute to be made public; and

. . . . .

The term "law enforcement intelligence information" means information associated with an identifiable individual compiled by a law enforcement agency in the course of conducting an investigation of an individual in anticipation that he may commit a specific criminal act, including information derived from reports of informants, investigators, or from any type of surveillance. The term does not include criminal history information nor

does it include initial reports filed by a law enforcement agency describing a specific incident, indexed chronologically by incident and expressly required by State or Federal statute to be made public.

 Given this definition, it is difficult to conclude that the self-contained exemption in § 552a(e)(7) relating to law enforcement activity applies to any records which do not relate to specific past, present or future criminal acts. Merely because the FBI *may* act within its authority by monitoring the public or private speeches of a person in the course of a legitimate security investigation does not give it the right to maintain records relating to the contents of these speeches where the investigation does not focus on a past or anticipated specific criminal act.

The defendants appear to recognize this fact when they argue:

In this respect, each of the investigative activities described in paragraph 2 of the *in camera* Williamson affidavit was undertaken pursuant to the suspected violation of a particular federal statute [e. g., para. 2(a)], or in aid of a bona fide security investigation *to prevent the violation* of a federal statute. Defendants' Brief at 20.

Upon review of the Williamson affidavit, the Court is of the opinion that it cannot sustain the defendants' position. While the affidavit does reveal one particular instance where the investigation of a suspected violation by someone other than Jabara did lead to an investigation of Jabara, this investigation appears to have been of a limited nature. Furthermore, the Court cannot see how the records maintained regarding Jabara's political views as expressed in his speeches and discussions has any relevancy to the one criminal violation set forth in the Williamson affidavit.

Other than this one instance, the Court finds nothing in the Williamson affidavit to support a finding that the FBI investigation of Jabara was in response to any suspicion that he was involved in any past specific crime or that he would commit any spe-

cific future crime. Accordingly, the Court grants the plaintiff's motion for summary judgment with respect to the defendants' liability for the alleged violation of § 552a(e)(7).

Given the plaintiff's request to submit further memoranda on the issue of relief, the Court will not rule on the issue of whether file destruction is the appropriate remedy for this violation. Instead, the Court orders that the parties file memoranda and such other documents as will be relevant to a determination of the appropriate remedy for this violation.[16]

## VIII AUTHORITY OF THE FBI

As his seventh cause of action the plaintiff seeks relief based on an allegation that the FBI and the individual defendants lack the authority to conduct the type of investigation set forth in the complaint. Jabara characterizes the defendant's conduct as a "noncriminal domestic security" investigation. He argues that neither presidential directives nor statutes confer upon the FBI the authority to conduct such an investigation.

The defendants assert that their conduct falls within the express authority of the Attorney General set forth in 28 U.S.C. § 533:

> The Attorney General may appoint officials . . . (3) to conduct other investigations regarding official matters under the control of the Department of Justice and the Department of State as may be directed by the Attorney General.

The defendants also rely on 28 C.F.R. § 0.85(d), promulgated pursuant to this statute by the Attorney General. This regulation directs the FBI to "take charge of the investigative work in matters relating to espionage, sabotage, subversive activities, and related matters."

The Court is of the opinion that this issue cannot be resolved on a motion such as this. The question of whether the FBI's actions in the Jabara investigation were *ultra vires* depends not only upon the lack of an actual connection between Jabara and any potential threat to the national security; it also depends upon the reasonable suspicions of the FBI gathered from existing evidence.[17] Given the Court's earlier discussion regarding the factual issues surrounding the legitimacy and purpose of the FBI investigation of Jabara, the Court concludes that genuine issues of material fact exist with respect to whether the investigation of Jabara falls within the ambit of FBI authority. Consequently, the parties' respective motions for summary judgment on this issue are denied.

## IX CONCLUSION

For the reasons stated above, the Court grants in part and denies in part the defendants' motion to dismiss and for summary judgment. Similarly, the Court grants in part and denies in part the plaintiff's motion for summary judgment. The parties will be directed to supply the Court with further memoranda regarding the future course of this litigation and the declaratory, injunctive and monetary relief due the plaintiff on a date to be set by the Court.

**16.** In view of this, the Court is of the opinion that a decision on the plaintiff's contention that file destruction is warranted not only by the Privacy Act but also as an exercise of the Court's general equity powers is not required at this time. First, in view of the fact that a factual dispute exists with respect to the legitimacy and good faith nature of the FBI's investigation, it is not apparent that file destruction should be undertaken as a general equitable remedy. Second, the equitable remedy requested in Jabara's complaint is the same as that requested pursuant to the Privacy Act. Therefore, if file destruction is ordered under the Privacy Act, the question of whether file destruction is available as a general equitable remedy would be moot.

**17.** The Court rejects Jabara's contention that the statute, regulations and Presidential directives applicable to FBI authority limit the FBI to the investigation of present and future criminal acts. Without expressing any opinion with respect to purely internal matters, the Court is of the opinion that the FBI's investigative authority extends to authorized national security investigations involving foreign influences.