**ALLIANCE TO END REPRESSION,**
**et al., Plaintiffs,**

v.

**CITY OF CHICAGO, et al., Defendants.**

**No. 74 C 3268.**

United States District Court,
N.D. Illinois, E.D.

Dec. 30, 1985.

---

Richard Gutman, Chicago, Ill., for plaintiffs.

Peter Fitzpatrick, Sp. Asst. Corp. Counsel, Chicago, Ill., for defendants.

## MEMORANDUM OPINION AND ORDER

GETZENDANNER, District Judge:

This civil rights action, brought under 42 U.S.C. § 1983, presents the question of whether the first amendment permits local police authorities to infiltrate, observe, record, and disseminate information gathered on the lawful speech activities of private individuals and private organizations when the police have no reasonable suspicion of criminal conduct. This question is now before the court on cross motions for summary judgment.

The moving plaintiffs are the only remaining named plaintiffs in this historic civil rights litigation. The class claims were resolved through a consent decree entered in 1981 and the claims of all other named plaintiffs have been resolved through settlements. The court's decision on the cross motions for summary judgment will end this litigation because the parties have agreed to settlement of any successful claim and all parties have agreed not to appeal this decision.

### I. Background and Factual Summary

The parties have stipulated to the following material facts as to which there is no genuine dispute: Plaintiff Alliance to End Repression ("Alliance") is a civil liberties organization that seeks what it deems to be reforms in the criminal justice system of Chicago. Plaintiff Chicago Peace Council ("CPC") is a peace organization which advocates positions on peace issues and organizes demonstrations regarding United States foreign policy. Plaintiff William Hogan, a Roman Catholic priest, plaintiff Lucy Montgomery, a retired social worker, and plaintiff A.A. (Sammy) Rayner, Jr., a former Chicago alderman, are all United States citizens who in the past have actively exercised their first amendment rights. There is no evidence in the record that any of the plaintiffs conducted, or ever planned on conducting any violent or otherwise unlawful activity. Plaintiffs indicate that if the case were brought to trial, they would testify that their activities were always lawful. The only defendant in this case is the City of Chicago ("City"); claims against individual members of the Chicago Police Department have been settled and dismissed. The actions complained of in this case are deemed to have been done under color of state law and represent the official policy of the City of Chicago.

Plaintiffs, it is agreed, were the subjects of investigations carried out by a unit of the Chicago Police Department, the explicit purpose of which was to gather intelligence on non-criminal activity. The unit has been variously known as the Subversive Activities Section, the Subversive Activities Unit, and the Security Section. This unit investigated, without any reasonable suspicion of criminal conduct, the admittedly lawful activities of plaintiffs relating to their political speech and associations. The investigations were conducted by a variety of means. Among the more striking examples was the use of certain organization infiltrators. Specifically, some of the information accumulated on CPC was obtained by means of an informer who became CPC's treasurer and participated in the CPC decision-making process. Information was obtained on Alliance by means of an informer and an undercover agent, both of whom became Alliance board members and who participated in the Alliance decision-making process. More generally, a sizeable amount of information on the two organizations was obtained from newspaper clippings and clippings from other public sources of information. Intelligence was also gathered from various other informers whose level of infiltration or association with the plaintiffs is not specified. Finally, photographing, filming, videotaping and recording of plaintiffs' activities were also techniques employed in acquiring information. One such instance occurred when CPC, along with other groups, rented the grounds of a summer camp one weekend for a conference on nonviolent ways to "end war, racism, and repression." The police set up equipment opposite the camp and took photographs of all who were present at the conference.

Similarly, information gathered on the three individual plaintiffs was also obtained through the techniques of informer interviews, newspaper · clippings and photographs. There does not, however, appear to be any evidence that the informers were (or were not) specifically recruited by the police to duplicitously befriend the individuals and obtain their confidence. Finally, there is no evidence that any of the five plaintiffs were electronically surveilled, wiretapped, or photographed in their homes or other private enclaves.

The various forms of information thus obtained were filed and recorded in police dossiers on each of the plaintiffs. These dossiers are extensive. There are 13 volumes of reports on Alliance, 1,760 reports on CPC, 499 reports on Hogan, 220 on Montgomery, and 513 on Rayner. The contents of these reports include the identities of many members of the CPC and Alliance, what was discussed at meetings, and who made particular comments during the discussions. The reports on the individual plaintiffs contain the identities of their political associates and numerous other details of their public and personal lives.

The parties agree that the police department maintained a policy, directed against Alliance, which sought to "neutralize" and "nullify" its political influence, financial organization and support, and operational activities. The parties also have stipulated that as a result of the surveillance of CPC at the summer camp, a reporter who "accompanied" the police to the camp published a newspaper story in the Chicago Tribune which stated that "radicals" and "Communists" had used the property for a "secret revolutionary planning session." There is evidence, the parties agree, that a Security Section police officer, an undercover officer, and an informer testified inaccurately before the Senate Internal Security Subcommittee that Alliance was a "Communist Party front group." Alliance and CPC have indicated that, if the case were tried, they would testify that these statements were false and have injured their reputations. All five plaintiffs have indicated that they would testify that the entire surveillance operation has chilled their exercise of first amendment rights.

One year after this lawsuit was filed, the subversive unit of the Chicago Police Department was abolished. In 1981, the defendant City of Chicago agreed to a permanent injunction. *Alliance to End Repression v. Chicago*, 561 F.Supp. 537 (N.D.Ill. 1982), *rev'd on other grounds*, 742 F.2d 1007 (7th Cir.1984). Consent decrees were also signed with the federal defendants. *Alliance to End Repression v. Chicago*, 91 F.R.D. 182 (N.D.Ill.1982). The only remaining issue in this case is the constitutional validity of the police department's tactics with respect to the five remaining plaintiffs.

## II. Justiciability

Before the merits of the plaintiffs' claim can be decided the court must first address the defendant's argument that, under the authority of *Laird v. Tatum*, 408 U.S. 1, 92 S.Ct. 2318, 33 L.Ed.2d 154 (1972), the plaintiffs have no standing to bring this claim because it is nonjusticiable. Only if the plaintiffs can establish that their injury is justiciable can this court then undertake to determine whether the injury was inflicted in a manner inconsistent with the first amendment.

### A. The Relevant Case Law

In *Laird v. Tatum*, the plaintiffs had alleged that the mere existence of an Army surveillance system which investigated lawful and peaceful civilian activity chilled the exercise of their first amendment rights. The Supreme Court held, in a 5–4 decision, that "in the absence of a showing of objective harm or a specific threatened future harm," any claimed chill is merely "subjective" and therefore not justiciable.

Although the surveillance system under attack in *Tatum* and the one in this case are similar in that much of the intelligence was garnered from news publications, none of the information in *Tatum* was obtained through the clandestine infiltration some of the plaintiffs experienced here. In *Tatum*, when news publications were insufficient to satisfy Army intelligence needs, the

Army, which apparently was not claiming to have had any suspicion of criminal conduct, properly kept its surveillance limited to the public domain. The Court emphasized the public scope of the investigation as follows:

The information itself was collected by a variety of means, but it is significant that the principal sources of information were the news media and publications in general circulation. Some of the information came from Army Intelligence agents who attended meetings that were open to the public and who wrote field reports describing the meetings, giving such data as the name of the sponsoring organization, the identity of speakers, the approximate number of persons in attendance, and an indication of whether any disorder occurred. And still other information was provided to the Army by civilian law enforcement agencies.

408 U.S. at 6, 92 S.Ct. at 2322.

It was in this context that the plaintiffs in *Tatum* claimed that the compilation and storage of the acquired information chilled their exercise of first amendment rights. The Court felt that the intrusions the plaintiffs were objecting to were unlike and much less significant than those the Court had previously condemned on first amendment grounds, so any "chill" the plaintiffs claimed to be suffering was purely "subjective." The types of intrusions which the Court felt would cause an objective chill occurred in cases like *Baird v. State Bar of Arizona*, 401 U.S. 1, 91 S.Ct. 702, 27 L.Ed.2d 639 (1971) (state may not compel a person to disclose that person's associations in order to be admitted to state bar); *Keyishian v. Board of Regents*, 385 U.S. 589, 87 S.Ct. 675, 17 L.Ed.2d 629 (1967) (state may not discharge employees because of their political associations); *Lamont v. Postmaster General*, 381 U.S. 301, 85 S.Ct. 1493, 14 L.Ed.2d 398 (1965), and *Baggett v. Bullitt*, 377 U.S. 360, 84 S.Ct. 1316, 12 L.Ed.2d 377 (1964). In those cases, "the challenged exercise of governmental power was regulatory, proscriptive, or compulsory in nature, and the complainant was either presently or prospectively subject to the regulations, proscriptions, or compulsions that he was challenging." 408 U.S. at 11, 92 S.Ct. at 2324. By contrast, the chill involved in *Tatum*, based as it was on knowledge of the mere existence of a surveillance system, which collected data from information open to the public, and which caused no tangible harm to plaintiffs, could only have caused a subjective chill and was therefore nonjusticiable.

In the years since *Tatum*, courts have struggled to determine when a surveillance system became so intrusive as to create a reasonable or objective chill in a plaintiff and therefore present a justiciable controversy. As a substantial amount of time has elapsed since *Tatum*, it is possible to glean a pattern from these various court decisions. For example, as *Tatum* itself suggested, when the intelligence-gathering tactic involves only the use of police surveillance of meetings held open to the public, no objective chill is involved; conversely, when infiltration into private enclaves is present, a first amendment claim may be justiciable. *See e.g., Berlin Democratic Club v. Rumsfeld*, 410 F.Supp. 144 (D.D.C. 1976) (surveillance by illegal wiretapping and infiltration into "meetings and private associations" held to be factors rendering *Tatum* distinguishable and the claim justiciable); *Philadelphia Yearly Meeting of the Religious Society of Friends v. Tate*, 519 F.2d 1335, 1337–38 (3d Cir.1975) (only public surveillance involved; *Tatum* governs); *Socialist Workers Party v. Attorney General*, 510 F.2d 253 (2d Cir.1974) (Socialist Workers Party convention open to any person under 29; surveillance by FBI informants did not present justiciable controversy under *Tatum* ). When Justice Marshall was presented with the facts of *Socialist Workers Party* as Circuit Justice on an application to stay the Court of Appeals decision, he decided the issue of justiciability differently. While not disagreeing with the Court of Appeals' holding that the openness of the convention was a factor against justiciability, he wrote that *Tatum* should nevertheless be distinguished and the claim considered justiciable because of

the presence of other, apparently more important factors pertinent to an objective chill: "[T]he challenged investigative activity will have the concrete effects of dissuading some YSA delegates from participating actively in the convention and leading to possible loss of employment for those identified as being in attendance." *Socialist Workers Party v. Attorney General,* 419 U.S. 1314, 1319, 95 S.Ct. 425, 428, 42 L.Ed.2d 627 (1974). Subsequent lower court cases have picked up on the potential injury-to-employment factor as helping establish justiciability. *See e.g., Paton v. La Prade,* 524 F.2d 862 (3d Cir.1975) (justiciable claim presented when FBI maintained a 'mail cover' file on plaintiff, pursuant to a regulation which directed an investigation and record-keeping on all persons who wrote letters to Socialist Workers Party; file was alleged to possibly cause injury to future employment prospects); *Clark v. Library of Congress,* 750 F.2d 89 (D.C.Cir. 1984) (library worker who was investigated by FBI because of his political associations presented justiciable claim when he alleged the investigation cost him employment opportunities).

Thus it appears that in determining whether a claimed chill is objective, the Supreme Court in *Tatum* and the appellate courts in *Philadelphia Yearly* and *Socialist Workers Party* relied chiefly on the public nature of the surveillance tactics in concluding nonjusticiability. By contrast, Justice Marshall, *Paton,* and *Clark* focused on the specific adverse effects that the investigation was claimed to have on the plaintiffs. Some of the adverse effects which other courts have considered relevant to justiciability relate to issues other than employment, such as the damaged reputations caused by the dissemination of the accumulated information when such dissemination has occurred. *See e.g., Jabara v. Kelley,* 476 F.Supp. 561 (E.D.Mich. 1979) (justiciability where false and misleading reports of plaintiff's activities were disseminated in course of FBI investigation causing injury to reputation); *Berlin Democratic Club v. Rumsfeld,* 410 F.Supp. 144 (D.D.C.1976) (public dissemination of accumulated information in a false or defamatory manner was a factor in rendering claim justiciable); *Alliance to End Repression v. Rochford,* 407 F.Supp. 115 (N.D.Ill. 1975) (where police files were allegedly disseminated so as to damage academic and professional lives of plaintiffs, justiciable claim was presented).[1] Even police dissemination of truthful but stigmatizing information, such as police statements that certain individuals are the subjects of police intelligence files, if done without any lawful purpose, may be justiciable. *See Philadelphia Yearly,* 519 F.2d at 1339.

Other adverse effects relevant to justiciability, and closely related to the issue of how the surveillance is conducted, pertain to the instability and disruption of political associations caused by intrusive infiltrators and investigators. *See Founding Church of Scientology v. FBI,* 459 F.Supp. 748 (D.D.C.1978) (surveillance and infiltration of church group presented justiciable claim where FBI activities had effect of disrupting plaintiff organization and its growth by deterring supporters from joining); *Berlin Democratic Club,* 410 F.Supp. at 149 (claim justiciable when infiltrators disrupted private organization by providing it with false information and soliciting illegal actions); *Handschu v. Special Services Division,* 349 F.Supp. 766 (S.D.N.Y.1972) (government may use infiltrators and informers generally, but not to solicit unlawful activity or create feelings of mutual

---

1. In their brief in answer to defendant's motion for summary judgment, plaintiffs argue that the *Alliance* opinion, written in response to defendant's motion to dismiss the complaint in this case ten years ago, governs whether *Tatum* applies to the facts of this case. It is true that *Alliance* held that *Tatum* and its progeny did not bar plaintiffs' claim, as set forth in the allegations of the complaint. However, that opinion is not dispositive of the current motions for summary judgment, since the court is no longer working with the same set of allegations. Instead, the court has been presented with a set of stipulated facts which are in many ways different from the allegations of the complaint. The court must therefore reassess the relevance of *Tatum* in light of this new set of facts.

distrust and suspicion among group members). *See also Socialist Workers Party v. Attorney General*, 419 U.S. 1314, 95 S.Ct. 425, 42 L.Ed.2d 627 (1974) (Marshall, Circuit Justice) (surveillance which has effect of deterring supporters from joining organization, even when surveillance conducted in public, may present justiciable claim); *Jabara v. Kelley*, 476 F.Supp. 561 (E.D. Mich.1979) (investigation of individual which has effect of deterring others from associating with him is factor in favor of justiciability), *vacated in part on other grounds*, 691 F.2d 272 (6th Cir.1982), *cert. denied*, 464 U.S. 863, 104 S.Ct. 193, 78 L.Ed.2d 170 (1983).

To summarize, these various considerations have been restated by the *Philadelphia Yearly* and *Berlin* opinions:

> We think it is clear that *Tatum* supports the action of the district court here [dismissing the complaint] to the extent the complaint alleges a constitutional violation on the basis of mere police photographing and data gathering at public meetings. We say this because such activity by law enforcement authorities, without more, is legally unobjectionable and creates at best a so-called subjective chill which the Supreme Court has said is not a substitute for a claim of specific present harm or a threat of specific future harm. [footnote omitted]

*Philadelphia Yearly Meeting of the Religious Society of Friends*, 519 F.2d at 1337. And in explaining when a claim presents a justiciable controversy, the *Berlin* court stated:

> Thus, while collection and retention of information, if collected in a legal manner, cannot be challenged, public dissemination of that information in a false or defamatory manner and with no lawful purpose, disruption of legitimate activities, termination of employment, illegal electronic surveillance, and other forms of harassment are subject to challenge as beyond "legitimate surveillance activities."

*Berlin Democratic Club*, 410 F.Supp. at 151.

## B.  Application of Law to Parties

Having surveyed the case law, the court can now determine whether the parties here have presented a justiciable claim. Careful examination of the evidence leads this court to conclude that the actions of the police department with respect to Alliance, CPC, and Montgomery created justiciable claims, but there is insufficient evidence in the record to warrant a similar conclusion as to the individual plaintiffs Hogan and Rayner.

### 1.  Alliance

The case for Alliance is the strongest of all the plaintiffs. The record establishes that the police surveillance of Alliance was far more intrusive than the "passive observational activities upheld in *Tatum.*" *Handschu*, 349 F.Supp. 766, 771. First, an informer and an undercover agent both became board members of Alliance and participated in the Alliance decision-making process. This sort of infiltration, especially as to the undercover police officer, weighs heavily in the determination that Alliance's claimed chill is reasonable. The board of a political organization is certainly not open to the public. Almost by definition, the "board" is a select group of an organization's members who develop and decide the goals and directions that the organization is going to take. When the police are permitted to infiltrate and record comments made by the members of an organization's highest levels, and to participate in the organization's top decisional authority, there will inevitably be some distrust and suspicion bred among the organization's members. The use of police officers to infiltrate an organization and thereby cause disruption of the organization through the creation of distrust, has already been held to be a factor establishing justiciability. *See e.g., Handschu*, 349 F.Supp. 766.

These objections to the police undercover infiltrator can also be raised against the informer who also became an Alliance board member. In general, of course,

there is nothing wrong with the police receiving and retaining information freely reported to it by informers. Plaintiffs themselves are willing to recognize this principle. *See* Plaintiff's Brief in Opposition to City's Motion for Summary Judgment at 6. Thus, if an Alliance board member decided to turn against her or his organization and inform the police of Alliance's activities, the police would be free to question the individual. But that is not what happened here. The record clearly states that an informer "became" a board member. The implication is that a person who had already been a police informer took on the additional duplicitous role of an Alliance board member. For the same reasons that the police may not use its own undercover agents to infiltrate the high, private levels of an organization—it risks fostering the disruptive feelings of organizational distrust—the police may not participate in a venture whereby existing informers are used to infiltrate the private levels of a political association. Admittedly, the record does not indicate as clearly as it might that the police here actually told its informer to become an Alliance board member. Possibly (though unlikely) the police played no role in encouraging the informer to become a board member. Nevertheless, the court cannot find any evidence in the record to lend support to this view. To the contrary, the evidence suggesting that the police did participate in the decision to have its informer become a board member is too weighty to ignore. In particular, the defendant has agreed that the police department targeted Alliance to "nullify" its sympathetic and political influence, its financial and organizational support, and its operational activities. This glaring admission not only supports the court's earlier conclusion that the effect of the infiltration into the private levels of the organization was to disrupt Alliance, but it also strongly suggests that the police participated in the decision to have the informer infiltrate the Alliance board.

Another factor relevant to justiciability present in this case is the evidence, uncontradicted in the record, that Alliance's reputation was injured as a result of the police surveillance activities. Specifically, there is uncontradicted evidence that a Security Section police officer, an undercover police officer, and an informer all testified inaccurately before the Senate Internal Security Subcommittee that Alliance was a "Communist Party Front Group." The police dissemination of false information pertaining to an organization or person under police surveillance has been previously discussed as rendering a chill more objective. While it is not clear that the defamatory statements about Alliance were intended to be false, the court is again able to infer such intent from the police department's admitted policy of targeting Alliance for "nullification" and "neutralization."

■ In sum, the police infiltration into the private high levels of the Alliance organization, the "nullification" policy, and the injury the police caused to Alliance's reputation through disseminating false information together make the "chill" Alliance has claimed reasonable and objective. Alliance's first amendment claim is therefore justiciable and not barred by *Tatum*. It remains to be decided, however, whether the claim is nevertheless defeated because the first amendment permits the sort of police activity involved here.

### 2. CPC

The CPC case, though perhaps not as strong as Alliance's, still demonstrates enough police intrusiveness so that the chill is objective. As with Alliance, the parties here agree that an informer became a treasurer of CPC and participated in CPC's decision-making process. However, unlike Alliance, there is no evidence that an undercover agent was involved, or that CPC was the target of a nullification plan. Therefore, it is not so easy to conclude that the police participated in the decision to have its informer become the treasurer. Nevertheless, because the position of treasurer is obviously one of the most select and sensitive of all possible levels, and because infiltration at such a level implicates the very essence of the first amend-

ment right to freely associate, the court is willing to infer police complicity on less strong evidence. For CPC, sufficiently convincing evidence exists to infer police complicity. The record establishes that independent of its specific policy targeting Alliance for neutralization, the police department had a neutralization policy against other civic organizations that the defendant admits are peaceful, including the Spanish Action Committee of Chicago, the Citizens Action Program, and the National Lawyers Guild. The existence of such an extensive "neutralization" program against organizations which, like CPC, are peaceful, leads this court to conclude that the police department at least knew of and concurred in the CPC's informer's decision to move into the rank of treasurer, thus making the police accountable for the infiltration.

As with Alliance, there is also present here another factor in favor of justiciability—evidence of damaged reputation from disseminated information. The record shows that when the police took photographs of CPC members at the weekend camp conference from their position "opposite" the camp,[2] the police were accompanied by a reporter for the Chicago Tribune. Subsequently, the reporter wrote a story stating, falsely, that "radicals" and "Communists" had used the property for a "secret revolutionary planning session." In fact, the purpose of the conference was to study nonviolent ways "to end war, racism, and repression." The police, then, by inviting[3] the reporter to the camp scene and conveying some of their information about CPC to him, contributed to the dissemination of damaging information. The consequence, for which there is evidence in the record, was that CPC's reputation was injured.

■ In sum for the case of CPC, the court is convinced that the very high level of infiltration, and the damaged reputation from the police—caused disseminated information make CPC's chill objective. CPC's first amendment claim is therefore justiciable.

### 3. Rayner and Hogan

Unlike their organizational counterparts, these two individual plaintiffs have failed to produce evidence that establishes a justiciable controversy. These plaintiffs do claim that they have been chilled as a result of the police surveillance and recordkeeping of their peaceful activities. But unlike the claims of the organizations, there is no evidence that the surveillance tactics resulted in any of the specific effects or was conducted in any of the ways which courts have previously identified as relevant to rendering the chill objective. For example, unlike the organizational plaintiffs, there is no evidence that police have damaged the plaintiffs' reputations or that the police created feelings of distrust among the plaintiffs' political associates. In particular, unlike *Jabara*, there is no evidence that other people are now deterred from associating with the individual plaintiffs. Unlike *Clark*, there is no evi-

---

**2.** It is not clear from the record whether the police position "opposite" the camp was open to the public, or whether CPC and the other groups had some reasonable expectation that no one would have access to that position without their permission. Plaintiffs do not argue that the police concealed their position or placed themselves somewhere that was not generally accessible to the public. In the absence of any arguments on the impropriety of the police setting up their equipment "opposite" the camp, the court will not rule on that question. It is worth noting, however, that police photography from places open to the public has been held not to produce a justiciable first amendment claim. *See Philadelphia Yearly Meeting of the Religious*

*Society of Friends v. Tate,* 519 F.2d 1335, 1337 (3d Cir.1975).

**3.** Although the record indicates that the reporter merely "accompanied" the police to the camp, I think the conclusion is inescapable that the police invited the reporter to watch the conference events. To conclude otherwise would be to suggest the uncanny coincidence that the police and the reporter were investigating the same organization at the same time and place and just happened to independently arrive at the campsite together. Without at least some argument by defendant that this is what in fact happened, I must conclude that the reporter was actually invited to attend.

dence that plaintiffs' employment opportunities have been injured. Unlike *Founding Church of Scientology*, there is no showing that these two individual plaintiffs were harassed.

Finally, the police surveillance tactics, unlike the complaint allegations at issue in the *Alliance* opinion, were not shown to be illegal or otherwise an invasion of some reasonable expectation of privacy with respect to these individual plaintiffs. The Rayner file consists, almost entirely, of nothing more intrusive than clippings from Chicago newspapers. The Hogan file similarly contains many newspaper clippings. There is no showing of illegal wiretaps, or other forms of unlawful surveillance. Although informers gave the police some of the information in the files, there is no showing that the police directed or paid the informers to duplicitously befriend or remain friends with the plaintiffs while informing on them. Without any such evidence, and the burden of proof is on the plaintiffs, the court can only presume that these informers volunteered information to the police on their own initiative when the police interviewed them. There is certainly nothing illegal or unconstitutional about this, even in the absence of some reasonable suspicion of criminal conduct.[4] *See e.g., Handschu*, 349 F.Supp. 766, 769; *Socialist Workers Party v. Attorney General*, 510 F.2d 253, 257 (2d Cir.1974) ("no one has yet suggested that the FBI be restrained from receiving information freely reported to it"). Any chill resulting from this sort of activity must be considered subjective under *Tatum*.

■ Thus, all that the court has in the record with respect to these two plaintiffs is a claim of a chill from a police surveillance system which acquired its information from various publications and from interviews with persons who knew the plaintiffs. This is the sort of situation which *Tatum* found nonjusticiable: a claim of chill based on the mere existence of a general system of public surveillance and no showing of any specific adverse effects. Under *Tatum*, such a chill is considered subjective and cannot support a justiciable claim.

### 4. Montgomery

The Montgomery file is troubling to the court. The file contains much more than newspaper clippings. Besides extensive biographical information, such as her date of birth, weight, eye color, schooling, marriages, and current address, the file contains a detailed chronology on Montgomery's political activities and her social and personal activities. Specifically, this chronology outlines when Montgomery participated in certain political and social groups, where the participation took place, and the nature and extent of the participation. There is even a report included in the file on the conversations that took place during a private cocktail party at Montgomery's home. The file contains other information that is generally not considered public. There is an extensive report on various checks Montgomery drafted and the accompanying bank statements. The file also

**4.** A different question might be presented if plaintiffs had presented evidence showing that the police did more than simply interview informers who had come to the police with information on the plaintiffs. In particular, if after receiving information for the first time from an informer, the police directed the informer to keep up the appearance of a friendly relationship with the person informed on while continuing to inform on him, a constitutional claim might be stated since the police admit they never had any reasonable suspicion of criminal conduct. Although *Hoffa v. United States*, 385 U.S. 293, 87 S.Ct. 408, 17 L.Ed.2d 374 (1966) permits police participation in informer duplicity, the *Hoffa* investigation took place in the

context of reasonable suspicion of criminal conduct. *Hoffa's* holding was based on the fourth amendment, but in *Jabara v. Kelley*, 476 F.Supp. 561, 570–75, after a lengthy discussion, the court held that a first amendment analysis leads to the same result. Thus, under *Jabara*, when police participate in getting an informer to maintain a duplicitous relationship with an individual, there must be a "good faith" investigation underway. There was no good faith investigation underway here. However, since the record for the individual plaintiffs does not establish any police complicity in getting the informers to maintain a duplicitous relationship with the individual plaintiffs, no constitutional claim is presented.

contains details on her then current and former husbands. Specifically, the file describes where her then current husband went to college and law school, where he had positions of trustee and membership on boards of directors, and the clubs to which he belonged. Details on Montgomery's children, by both husbands, their names, ages, and schooling are all in the file. Medical information about the husband and one child are detailed in the file. Other details about Montgomery's past and then current political, social, and personal activities are enumerated at length.

■ If all this information was obtained from published sources or informants whom the police did not recruit, then *Tatum* would likely bar Montgomery's claim. Nevertheless, the information covers such a wide range of Montgomery's public and personal activities that one cannot help but get an entire character portrait from reading the file. It seems that there should come a point when, in tenaciously tracking and piecing together the details of a person's life from multifarious sources, the resulting probe becomes so intrusive as to amount to an invasion of privacy even if the individual pieces of the probe are from public sources. Such an intrusion has happened here. In these circumstances, the burden of proving that the information indeed did come from exclusively public sources, such as newspapers or volunteer informants whom the police did not direct themselves, should be on the defendant before *Tatum* bars the claim. Because the City has not presented any evidence suggesting that all the information was accumulated from public sources, and because it is reasonable to infer that much of the extensively personal information in the file could only be obtained from nonpublic sources, the court concludes that Montgomery's chill is reasonable, objective and justiciable.

### III. The Merits of the First Amendment Claims

Having established that Alliance and CPC present justiciable claims, the court must now decide whether those claims are meritorious under first amendment doctrine. Put another way, given that the police tactics have reasonably chilled Alliance and CPC, is that chill nevertheless justified under first amendment standards?

■ The first amendment, of course, protects the rights of all citizens to hold differing political beliefs and belong to lawful political parties and associations. *Elrod v. Burns*, 427 U.S. 347, 356-60, 96 S.Ct. 2673, 2681-83, 49 L.Ed.2d 547 (1976); *Buckley v. Valeo*, 424 U.S. 1, 11, 96 S.Ct. 612, 630, 46 L.Ed.2d 659 (1976), *NAACP v. Button*, 371 U.S. 415, 430, 83 S.Ct. 328, 336, 9 L.Ed.2d 405 (1963). As stated before, the parties to this case do not dispute the lawfulness of the Alliance and CPC associations. Significant impairments of these first amendment rights, as in the case of an objective chill, must withstand exacting scrutiny and may not be justified on a showing of a mere legitimate state interest. *Elrod v. Burns*, 427 U.S. at 362, 96 S.Ct. at 2684, *Buckley v. Valeo*, 424 U.S. at 64, 96 S.Ct. at 656; *Kusper v. Pontikes*, 414 U.S. 51, 58, 94 S.Ct. 303, 308, 38 L.Ed.2d 260 (1973). The District of Columbia Circuit in *Clark v. Library of Congress* carefully articulated these first amendment standards as applied to the police surveillance context:

> Exacting scrutiny is especially appropriate where the government action is motivated solely by an individual's lawful beliefs or associations, for government action so predicated is imbued with the potential for subtle coercion of the individual to abandon his controversial beliefs or associations. Whether or not the government intended to punish or coerce the individual cannot be the sole test of legitimacy in such governmental action. Where the government action inflicts a palpable injury on the individual because of his lawful beliefs, it has the direct and consequent effect of chilling his rights to freedom of belief and association. For these reasons, the Supreme Court has held such governmental actions may be justified only upon a showing of a para-

mount or vital government interest. *Elrod v. Burns,* 427 U.S. at 362 [96 S.Ct. at 2684]. The burden is on the government to show the existence of such an interest. *Id.* Moreover, the government must demonstrate that the means chosen to further its compelling interest are those least restrictive of freedom of belief and association. *Id.* at 362–63 [96 S.Ct. at 2684–85].

*Clark v. Library of Congress,* 750 F.2d 89, 94 (D.C.Cir.1984).

## 1. Alliance

The City admits that the police surveillance of Alliance was conducted without any reasonable suspicion that Alliance was engaged in criminal conduct. Nevertheless, the police infiltrated the Alliance board pursuant to a "neutralization" policy and disseminated false and damaging information about Alliance while testifying to a congressional committee. In the discussion below I conclude that the City has not sustained its burden of demonstrating that these tactics were the least drastic means to achieving a compelling state interest.

There can be no doubt that, even in the absence of a reasonable suspicion of criminal activity, the government has an interest in investigating civilian conduct so that it may determine whether some further action is needed to protect the public from criminal behavior. This interest, including specifically the government's interest in using informers and infiltrators to investigate lawful conduct, has been described elsewhere as "legitimate." *Handschu,* 349 F.Supp. at 769. But, as *Elrod* teaches, a mere legitimate interest is insufficient to justify an investigatory tactic that creates an objective chill of first amendment rights. The City must show that infiltrating a high, private level of Alliance, without any reasonable suspicion of criminal activity, was the least drastic means in furtherance of a compelling state interest. Similarly, the City must show a compelling state interest in intentionally giving false testimony about Alliance at congressional hearings.

The court first examines the infiltration activities. The Alliance case is unlike the typical case of police surveillance. The City has not simply sent informers and infiltrators to open meetings to observe and record events. It has sent its agents to participate in private meetings which are reasonably expected to be open only to those who have a sincere interest in exercising responsibility for the organization. The court cannot find, and the City does not proffer, a compelling reason for permitting this sort of disruptive infiltration in the absence of any reasonable suspicion of criminal conduct. In similar cases, such police conduct, in the absence of any "good faith" basis for an investigation, has been held to be violative of the first amendment. *See e.g., Jabara v. Kelley,* 476 F.Supp. 561 (government cannot justify deterring political associations in the absence of a good faith criminal investigation); *Clark,* 750 F.2d 89 (objective chill can be justified only by a good faith investigation), *Paton v. LaPrade,* 469 F.Supp. 773 (D.N.J.1978) (good faith criminal investigation needed before a mail cover regulation can issue).[5] Even if there were a compelling interest in private, high level infiltration without a reasonable suspicion of criminal conduct, the City has not shown why the information sought could not also be acquired by

---

**5.** None of the cases provides a precise definition of a "good faith" criminal investigation. However, it appears clear that a good faith investigation requires more than a mere "subjective perception of a threat." *Jabara v. Kelley,* 476 F.Supp. 561, 574 n. 7. Accordingly, the court is of the opinion that a good faith criminal investigation requires at least some reasonable suspicion of criminal conduct. While the standard of reasonable suspicion of criminal conduct is itself imprecise, it is not as stringent as probable cause. *See Llaguno v. Mingey,* 763 F.2d 1560,

1565 (7th Cir.1985). The Supreme Court has often recognized a difference between a reasonable suspicion of criminal conduct and—what is required for probable cause—a reasonable probability of criminal conduct. *See United States v. Cortez,* 449 U.S. 411, 421–22, 101 S.Ct. 690, 696–97, 66 L.Ed.2d 621 (1982); *United States v. Brignoni-Ponce,* 422 U.S. 873, 880, 95 S.Ct. 2574, 2579, 45 L.Ed.2d 607 (1975); *Adams v. Williams,* 407 U.S. 143, 145–46, 92 S.Ct. 1921, 1922–23, 32 L.Ed.2d 612 (1972); *Terry v. Ohio,* 392 U.S. 1, 21, 88 S.Ct. 1868, 1879, 20 L.Ed.2d 889 (1968).

less drastic means, such as sending infiltrators to Alliance meetings open to the public. In short, the police infiltration into Alliance's board in the absence of any reasonable suspicion of criminal activity violated Alliance's first amendment rights.

The City has also failed to demonstrate, or even argue, any interest whatever in intentionally testifying falsely to a congressional committee. Although the City certainly has an interest, indeed the duty, to answer Congress' lawful requests for testimony as to the information the police have lawfully accumulated, this court can conceive of no reason, let alone a compelling one, which would justify the intentional giving of false testimony to that or any investigative body. Therefore, this particular action of the police also violated Alliance's first amendment rights.

## 2. CPC

The discussion as to the Alliance infiltration applies with equal force to CPC. The police, it is admitted, had no reasonable suspicion that CPC was engaged in any criminal conduct. Therefore, the police involvement in infiltrating one of its informers into the position of treasurer, and the inevitable disruption and distrust within the organization caused by such infiltration, cannot be justified on first amendment grounds, especially in the absence of any argument that the information thus obtained could have been acquired by less drastic means.

The police action in inviting the Tribune reporter to the CPC weekend conference at the camp location also unnecessarily infringed on CPC's first amendment rights. Even if this court were to assume that all of the statements the police made to the reporter about CPC were true, and it was only the reporter who then published the falsehoods, there is no reason why the police had to invite the reporter to the campsite at all. The court fails to see how the police investigation was advanced by the presence of a 'newspaper reporter at the scene of investigation. If anything, the published story may have made it more

difficult for the police to conduct their investigation. In any event, the City offers, and I find, no compelling reason for permitting the police to render available to a reporter information about CPC's lawful conference activities to a newspaper, thereby enabling that reporter to write a story on those activities. *See Philadelphia Yearly,* 519 F.2d at 1338 ("It is not apparent how making information concerning the lawful activities of plaintiffs available to non-police groups [television broadcasters] or individuals could be considered within the proper ambit of law enforcement activity.") Therefore, the police action in inviting the newspaper reporter to the campsite violated CPC's first amendment rights.

## 3. Montgomery

As to Montgomery, the police again admit they had no reasonable suspicion of criminal conduct. Yet the police accumulated an extensive dossier detailing almost all facets of Montgomery's life, from her participation in political events to conversations at a cocktail party, to medical facts about her child. Without any reasonable suspicion of criminal conduct, the court cannot conceive of any remotely compelling interest the City has in recording which political activities an individual chooses to involve herself in, let alone to whom the individual writes her checks, and any family medical problems that may exist. The recordation of such information can only serve to stifle the very sort of lawful, robust dissent that the first amendment, from its inception, was intended to protect. Therefore, the police maintenance of a dossier on Montgomery which was so extensive as to create an entire portrait of her personal, family, financial, and political life, violated her first amendment rights in the absence of a reasonable suspicion of criminal conduct, and in the absence of any evidence that the information came from exclusively public sources.

## IV. Conclusion

The defendant has violated the first amendment rights of Alliance, CPC, and Montgomery in the specific ways described

above.   Rayner and Hogan have not presented justiciable first amendment claims so the court does not consider the merits of those claims.  In accordance with the agreement of the parties, the court enters judgment in favor of plaintiffs Alliance and CPC, and against defendant City of Chicago, for $20,625 apiece plus costs, and enters judgment in favor of plaintiff Montgomery for $10,000 plus costs.  Judgment is entered in favor of defendant City of Chicago as against plaintiffs Hogan and Rayner for lack of justiciability.

It is so ordered.