**COMMITTEE IN SOLIDARITY WITH THE PEOPLE OF EL SALVADOR, et al., Plaintiffs,**

v.

**William F. SESSIONS, et al., Defendants.**

**Civ. A. No. 88–3430.**

United States District Court, District of Columbia.

Jan. 11, 1989.

Margaret L. Ratner, Michael Ratner, New York City, James Klimaski, Washington, D.C., for plaintiffs.

R. Joseph Sher, U.S. Dept. of Justice, Washington, D.C., for defendants.

### MEMORANDUM AND ORDER

REVERCOMB, District Judge.

This is an action brought by individuals and organizations that have engaged in political activities which resulted in their becoming subjects of an investigation conducted by the Federal Bureau of Investigation ("FBI"). The investigation was begun early in 1983. Because of the information upon which the investigation was based, the investigation was listed by the FBI under the heading "foreign counter-intelligence/international terrorism." The current director of the FBI has stated in congressional testimony that the investigation

was begun without a proper predicate, since the Bureau's paid informant, Frank Varelli, was found to be unreliable. The FBI made no assessment of his reliability at the inception. Despite this initial flaw, the investigation was quite extensive and lengthy, and continued to be so after Varelli's trustworthiness was found to be wanting. All 59 FBI field offices eventually became involved. The original topic of the investigation, which was possible links between CISPES and foreign-sponsored terrorism, was broadened to encompass the investigation of many other groups and individuals who opposed the Reagan Administration's foreign policy in Central America. The scope of the investigation was widened to include persons who attended demonstrations against U.S. policy, those who publicly opposed that policy in print or on the airwaves, were mentioned by others as being opposed to it, etc. Undercover FBI agents attended meetings and collected information. Paid informants were utilized, and Frank Varelli, mentioned above as the source of the original information concerning CISPES, became a dues-paying member of the Dallas branch of CISPES. The FBI also conducted interviews of friends, family, associates and employers of CISPES members and other subjects of the investigation. The plaintiffs' exhibits support their claim that derogatory information about CISPES and its members was distributed by FBI agents doing this investigative work. Plaintiffs are justifiably worried that this may have worked to their detriment.

The plaintiffs seek a preliminary injunction, pursuant to Federal Rule of Civil Procedure 65, enjoining the FBI from further use and dissemination of the files and information compiled as a result of the investigation, mandating the retrieval of files and information already disseminated and causing all such materials to be sealed and deposited in the National Archives.

There are four factors the Court must consider in determining whether to grant the extraordinary remedy of preliminary injunctive relief. These are 1) whether the plaintiff faces a real and immediate threat of irreparable injury in the absence of the award of preliminary relief; 2) the likelihood that the plaintiff will prevail on the merits of the claim; 3) the possibility of substantial harm to third parties should the Court award preliminary relief; and 4) the public interest. *Washington Metropolitan Area Transit Commission v. Holiday Tours, Inc.*, 559 F.2d 841, 842–43 (D.C.Cir. 1977). The Court will address each prong of this test in turn.

1. Threat of Irreparable Injury.

As the government points out in its opposition to the plaintiffs' motion, a *sine qua non* of preliminary injunctive relief is that there be a real and imminent threat of harm. For preliminary relief to be granted, the harm which the plaintiffs will suffer must be *irreparable*, that is, not susceptible to remedy during the ordinary course of litigation. This rule was elaborated in *Virginia Petroleum Jobbers Association v. Federal Power Commission*, 259 F.2d 921 (D.C.Cir.1958). There, the Court of Appeals stated that

> [t]he key word in this consideration is *irreparable*. Mere injuries, however substantial, in terms of money, time and energy necessarily expended ... are not enough. The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm.

259 F.2d at 925.

A considerable portion of the material submitted by the plaintiffs in this case concerns events which occurred during the course of the FBI investigation of CISPES. That investigation, which yielded the files which the plaintiffs would have the Court order sealed, was terminated in 1985. The harms alleged by the plaintiffs relating to the conduct of the investigation, even if they amount to illegal or unconstitutional activities, do not create a *present* entitlement to *injunctive* relief because the investigation is no longer alive, and the FBI has publicly discredited it in its entirety. Thus, even if the Court were to accept at this stage in the litigation the plaintiffs' argu-

ment that the conduct of the CISPES investigation was in violation of their rights, the preliminary equitable remedy sought by the plaintiffs is not available "where there is no showing of any real or immediate threat that the plaintiff will be wronged again...." *City of Los Angeles v. Lyons*, 461 U.S. 95, 111, 103 S.Ct. 1660, 1670, 75 L.Ed.2d 675 (1983). The fact that Director Sessions has come forward and testified before Congress that the investigation was baseless should suffice to quell many of the fears of those plaintiffs who are concerned that the FBI's use of derogatory information about CISPES in interviews might have injured their reputations. The Bureau has also moved to restrict access to the CISPES files. The course of this litigation should also serve a similar purpose. It seems to the Court that the Director's statements and actions, as well as the public record in court, should allay present and future concerns regarding reputation. Therefore, the Court will restrict its evaluation of the plaintiffs' claim for preliminary relief to those portions of their argument which relate to *concrete* present and future harms.

The plaintiffs have submitted three declarations which address the question of present injury. The first is that of CISPES Operation Director Lent, who avers upon information and belief that the investigation has caused CISPES to lose funds, and has deterred individuals from joining CISPES. The Court finds that this declaration is conclusory and speculative. There is no basis offered in the declaration for the assertion that CISPES has lost funds because of the FBI's investigation. As the government points out, the declaration fails to set out the organization's annual receipts, leaving the Court with no basis for concluding whether CISPES has actually lost funding or not, let alone whether the FBI's investigation has caused the funds to diminish. Similarly, Mr. Lent's assertion that the investigation has deterred individuals from joining CISPES is supported by nothing more than the declarant's belief that this is so. Mr. Lent fails to offer a single example. The Court need not find that Mr. Lent's allegations are baseless in

order to conclude that they do not meet the level required to justify preliminary relief. But the showing required for a preliminary injunction is that "a plaintiff must do more than merely allege imminent harm sufficient to establish standing; a plaintiff must *demonstrate* immediate threatened injury as a prerequisite to preliminary injunctive relief." *Caribbean Marine Services Co. v. Baldrige*, 844 F.2d 668, 674 (9th Cir.1988) (citations omitted). The Lent Declaration has failed to make such a demonstration.

Similarly, the declarations of Messrs. Shea and Ryan fail to demonstrate the required "immediate threatened injury" which cannot be redressed in the ordinary course of litigation. The purport of these declarations is that the individuals named as part of the CISPES investigation suffer a present and future harm in that the existence of files identifying them with CISPES would preclude employment in the Federal service. There are at least three flaws with the attempted use of these declarations to demonstrate the level of harm required for injunctive relief.

First, as the Government points out in its opposition, the declarations fail to take into account the effect of the disclosure restrictions already promulgated by Director Sessions, which forbid disclosure except under the authority of senior officials at FBI headquarters. These restrictions make much less likely the plaintiff's proffered scenario of mindlessly bureacratic application of the results of the CISPES investigation. In any event, the declarations are speculative, since no plaintiff has averred that he is presently seeking employment in the Federal service, nor has any plaintiff come forward who has future or contingent plans to that effect.

Second, the only example of a request for information the plaintiffs present occurred in 1984, *i.e.*, while the investigation was still in progress. In that instance, the Department of Agriculture submitted a name-check request. This request did not seek, nor did it yield, information on an individual; the request concerned CISPES itself, and in response to it the FBI supplied information on the organization, not

on an individual. Plaintiffs' Exhibit 39. The plaintiffs argue that this amounted to supplying derogatory information concerning an individual. In point of fact, the FBI's response was that "membership in this organization does not necessarily pose a threat to the security of the United States." Although it is difficult to argue that this is praise, it is also not obvious to the Court that the statement is "derogatory" as regards an individual member. Literally, the statement simply says that membership does not constitute a *per se* security threat. The Court does not find that more laudatory language should have been required of the FBI at the time the request was made, *i.e.*, during the investigation. Furthermore, the information supplied concerned the *group*, not an individual. The plaintiffs have failed to allege a single instance of harm to an individual job applicant, whether during the course of the investigation, after it was terminated, or since the present disclosure restrictions went into effect. Since the plaintiffs have failed to demonstrate any present or future threat to employment on the part of any individual plaintiff, (or even a present intention on the part of any individual plaintiff to apply for Federal employment), and have failed as well to allege any *other* present harms likely to befall the plaintiffs as a result of the investigation, they have failed to demonstrate an emergent injury sufficient to justify preliminary relief.

Third, the plaintiffs have failed to take into account the requirement that harm be *irreparable* in order to merit relief through a preliminary injunction. Even if the harms alleged in the three declarations were more concrete than they appear to be, there is no reason to believe that they could not be redressed during the ordinary course of litigation. Indeed, the FBI itself is in the process of fashioning a procedure for protecting the subjects of the CISPES investigation. It may or may not be the case that the FBI will be able to craft a solution to the harms complained of here. But it appears to the Court that plaintiffs' application for injunctive relief is premature at this stage, since the FBI has yet to finalize a procedure for dealing with the

files. Until the FBI has done so, the Court cannot determine whether the harms alleged by the plaintiffs could not be redressed by ordinary litigation.

The plaintiffs point out that the Supreme Court has held that "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373, 96 S.Ct. 2673, 2690, 49 L.Ed. 2d 547 (1976). But the burden on plaintiffs in seeking a preliminary injunction is to demonstrate that the injury about which they complain is in the present. The support they offer for the existence of present harms is speculative. The First Amendment violations to which they refer in arguing that this case is on point with such cases as *Handschu v. Special Services Division*, 349 F.Supp. 766 (S.D.N.Y.1972), and *Alliance to End Repression v. City of Chicago*, 627 F.Supp. 1044 (N.D.Ill.1985), are based on FBI activities during the course of the investigation, and before the public acknowledgment of Director Sessions that the investigation had been a mistake. The plaintiffs are not, after all, asking this Court to enjoin the investigation itself; they are asking for an injunctive resolution of the problem of what to do with its results. The injury which they identify is that of continuing dissemination of the contents of files containing information generated during the investigation. The threat of continuing dissemination has already been addressed by the Bureau to some extent, and further measures remain under consideration. The magnitude of the danger to be feared from what continuing dissemination there may be is remote and contingent, at least on the basis of the declarations offered by the plaintiffs, which fail to suggest any concrete situations in which the dissemination of material from the files to other government agencies would be likely to harm any of the plaintiffs in an irreparable way. These harms, for the purposes of this motion, must be considered along with the other factors in the preliminary injunction test; the fact that the harms concern, at least according to the plaintiffs, constitutional

issues, does not cause them to outweigh other factors automatically. (See sections 3 and 4).

2. Likelihood of Success on the Merits.

The plaintiffs' case is based on the First Amendment and the Privacy Act, 5 U.S.C. § 552a.

The basis of the First Amendment claim appears to be that the predicate for the investigation was too weak to justify so extensive an intrusion into plaintiffs' activities. The specific FBI measures taken were, apparently, within the proper limits of investigative activity; at least, the plaintiffs have not alleged any abuses of investigatory technique under the standard established by *Laird v. Tatum,* 408 U.S. 1, 92 S.Ct. 2318, 33 L.Ed.2d 154 (1972). If the basis of the First Amendment claim is simply that the investigation was without an adequate basis, the Court cannot conclude that plaintiffs are likely to succeed on the merits, since it is well settled that "the FBI would not be violating the First Amendment itself ... if it decided to investigate a threat that was not so immediate as to permit punitive measures against the utterer." *Alliance to End Repression v. City of Chicago,* 742 F.2d 1007, 1015–16 (7th Cir.1984) (*en banc*). The fact that an investigation fails to lead to an indictment or conviction does not create, in itself, a claim under the First Amendment.

Plaintiffs also contend that their First Amendment rights were violated because the investigation was politically motivated. This contention is backed up by the declaration of Professor Ferguson of Columbia University, an expert on 17th century political rhetoric. The Court does not find that the proferred rhetorical analysis makes it likely that the plaintiffs will succeed on the merits of a claim that the investigation was politically motivated. The analysis fails to show that "the language used by FBI agents during their investigation of CISPES reveals intellectual bias and an attitude of hostility toward the group under investigation;" still less do the examples given in the Ferguson Declaration demonstrate "that the FBI investigation was politically motivated." To begin with, it would be unrealistic to suppose that FBI agents, having been told that they were investigating possible terrorists, would refer to their subjects in neutral, or value-free language, assuming that such a style of discourse exists. Also, unless the plaintiffs intend to show that verbal denunciation of an investigative subject necessarily signifies something about the attitudes of FBI headquarters, the fact that FBI agents in the various field offices engaged in vituperative rhetoric proves nothing at all about the motivations of their superiors in authorizing the investigation. CISPES has no First Amendment right to be discussed in friendly terms by the FBI. The fact that the reports of individual agents appear to reveal a negative attitude toward CISPES may reflect the subjective reaction of the agents to what they observed, but the Court bears in mind that the task the agents thought they were performing was an investigation of possible links between CISPES and foreign terrorists. The ultimate decision to initiate, and then to suspend the investigation, was not made by the agents whose evaluations form the basis for Professor Ferguson's declaration, and the Court refuses to ascribe any importance to their characterizations of CISPES' activities as indications of the motivation behind the investigation.

As to the Privacy Act claim, while the Court does not prejudge its merits, the fact that the Act applies only to individuals, 5 U.S.C. § 552a(a)(2), which would preclude a recovery to CISPES as a group, and the possibility that there is a statute of limitations problem in invoking it, leads the Court to believe that the plaintiffs' likelihood of success on this claim is far from obvious. Furthermore, injunctive relief of the kind sought here may well be precluded under the Privacy Act, since the individual plaintiffs' allegations appear to fall into a class of claims for which Congress has authorized only an award of damages. *See Hastings v. Judicial Conference of the United States,* 770 F.2d 1093, 1104 (D.C. Cir.1985), *cert. denied,* 477 U.S. 904, 106 S.Ct. 3272, 91 L.Ed.2d 562 (1986). This leaves only the First Amendment claims as a basis for the injunction. These claims do

not seem so likely to succeed on the merits that they outweigh the other factors to be considered under *Virginia Petroleum Jobbers.* (See Sections 3 and 4).

### 3. Harm to Third Parties.

The extraordinary relief requested by the plaintiffs would impose costs on the FBI and would also involve a considerable effort on the part of the National Archives. Since the harm to plaintiffs discussed above is rather speculative, and the likelihood that plaintiffs will succeed on the merits is less than compelling, it is a serious possibility that the harm the requested relief might cause to the FBI would outweigh the rather fragile allegations of present injury to the plaintiffs. In addition to the immediate costs to the government (both the FBI and the National Archives) of retrieving the files, sealing them, and maintaining the documents once retrieved, there is the further possibility that granting plaintiffs' request would inhibit the FBI in the performance of its investigative duties. It would be inappropriate to impose these burdens on the FBI when there is every indication that the Bureau has made a good-faith effort to undo the ill effects of the investigation. To grant injunctive relief on this scale to the plaintiffs in a case where the Director of the FBI has already stated publicly that the investigation was inadequately grounded, and at a time when the Bureau is still in the process of devising a remedy to the problems complained of, thereby forcing the Bureau to go to extraordinary lengths to protect the subjects of this investigation, would be appropriate only if the harm to plaintiffs were much more emergent than it seems to be, and if the legal bases for their claims were plainly meritorious.

### 4. Public Interest.

In this case, the public interests at stake include the interest in effective law enforcement, the right to privacy as defended by the Privacy Act, and the right to free speech. The plaintiffs' claims under the First Amendment and the Privacy Act have been discussed above, but the essential tension in this case as it affects the public interest is between those claims and the more prosaic, but equally *valid,* interest in effective police investigation. Evaluation of the public interest is not a popularity contest, and the fact that the public interest is an elusive thing makes the balancing of these interests a delicate task. Nonetheless, the Court is persuaded that in this case the issue is best left for ordinary litigation. The plaintiffs have asked the Court to enjoin the FBI and to order extraordinary protective measures, as if it were obvious that without such relief *pendente lite* the plaintiffs would suffer undisputed and serious harms which could not be redressed in the courts through a normal lawsuit. The Court is simply not persuaded that this is the case. The relief requested would have a concrete impact on the FBI, in the form of a requirement that the Bureau perform a complicated and expensive task, as well as a less concrete effect, *i.e.,* potentially inhibiting the ability of the Bureau to perform investigations without *undue* fear that the results, if they failed to lead to a prosecution, would be used against the agency in court. Balanced against this is the conclusion that the harms alleged by the plaintiffs are speculative and contingent, and that the legal basis for the case is less than ironclad. Although the interests at stake are genuine, the form in which they are presented is insufficient to persuade the Court that it would be in the *public* interest to impair the functioning of the FBI by means of an injunction, prior to a complete airing of the legal merits of the case in the course of ordinary litigation.

Therefore, the plaintiffs' motion for a preliminary injunction is denied.